## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BCBSM, INC., d/b/a BLUE CROSS and BLUE SHIELD OF MINNESOTA, on behalf of itself and those similarly situated, | Case No. 1:21-cv-1884 |
| Plaintiff, | |
| v. | Class Action Complaint |
| VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, MARTIN SHKRELI, and KEVIN MULLEADY, | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota, ("Blue Cross of Minnesota"), files this action, individually on behalf of itself and as a class action on behalf of all others similarly situated, against Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG, Martin Shkreli (individually, as an owner and former director of Phoenixus AG, and a former executive of Vyera Pharmaceuticals, LLC), and Kevin Mulleady (individually, as an owner and director of Phoenixus AG, and a former executive of Vyera Pharmaceuticals, LLC), for damages, injunctive relief, and any and all other available forms of relief. Plaintiff demands a trial by jury on all issues so triable and complains and alleges as follows:

## I.     Nature of the Case

1.     This lawsuit challenges Defendants' scheme to monopolize the U.S. market for Daraprim—an essential, life-saving drug used in the treatment of toxoplasmosis—through an array of anticompetitive conduct that successfully thwarted generic competition for years and continues to cause supracompetitive prices to this day.

2.     Toxoplasmosis is a parasitic infection that can be fatal for people with compromised immune systems, particularly those with HIV/AIDS and cancer patients.

3.     Daraprim is the gold-standard treatment for toxoplasmosis. It was first brought to market in the United States in 1953 by a predecessor of GlaxoSmithKline ("GSK") and, for many decades, was affordable. However, in 2015, under the direction of Shkreli and Mulleady, Vyera and Phoenixus acquired the U.S. rights to Daraprim from the only existing supplier and raised the price from $17.50 to $750 per tablet—an increase of approximately 4,185 percent.

4.     Because Daraprim lacked patent and regulatory protections, Defendants understood that such an astronomical price increase would cause competitors to develop generic versions of Daraprim and sell them at lower prices. To prevent this, and to make their planned price increase

commercially viable, Defendants executed a scheme to thwart generic competition and force Daraprim purchasers to pay grossly inflated prices—all while concealing and misleading the public about their anticompetitive conduct.

5.      Defendants' scheme, which began before the price increase itself, spanned multiple fronts. First, Defendants prevented competitors from obtaining the Daraprim samples they needed to launch a generic product. Before a generic drug can be sold in the United States, the U.S. Food & Drug Administration ("FDA") requires manufacturers to perform testing to establish that the proposed generic drug is "bioequivalent" to the branded drug.

6.      Publicly, Defendants claimed they welcomed generic competition, calling it a "great thing." But in private, Defendants blocked competitors from performing generic testing through contractual restrictions that forbade distributors and other purchasers from selling Daraprim to generic companies. These resale restrictions, the purpose and scope of which Defendants repeatedly misrepresented, prevented would-be generic entrants from obtaining the Daraprim samples they needed to perform FDA-required bioequivalence testing.

7.      Defendants also ensured that their competitors would lack the necessary ingredients to manufacture generic Daraprim. Generic companies typically do not synthesize the active pharmaceutical ingredients ("API") used in their products, but rather purchase the API from specialty manufacturers. Defendants therefore worked to corner the market for pyrimethamine, the API needed to manufacture Daraprim, to cut-off generic companies' access.

8.      Defendants first entered into a lucrative exclusive supply agreement with Fukuzyu Pharmaceutical Co., Ltd. ("Fukuzyu"), then the only supplier approved by the FDA to manufacture pyrimethamine in the U.S. Later, when Defendants learned that RL Fine Chem. Pvt. Ltd. ("RL Fine"), another specialty supplier, was working with generic companies to develop

pyrimethamine, Defendants negotiated an exclusive supply agreement with RL Fine, despite already having locked-in Fukuzyu.

9.     Third, Defendants denied generic suppliers access to the sales data that was critical to determining whether developing generic Daraprim would be commercially viable. Generic companies acquire such data from third-party data-reporting companies that collect and aggregate sales information from the marketplace. Defendants imposed "data-blocking" agreements that prevented their distributors from selling Daraprim sales information to the data-reporting companies, thereby preventing Defendants' would-be competitors from accurately assessing, and thus pursuing, the market opportunity for generic Daraprim.

10.     Defendants sought to conceal their scheme through deception and fraud. They publicly denied their efforts to exclude generic competition, misrepresented the scope and purpose of their sale and distribution restrictions on Daraprim, and claimed what little was known about their scheme was necessary to serve patients' interests. None of their claims were truthful.

11.     The purpose and effect of Defendants' scheme has been to unlawfully monopolize the U.S. market for Daraprim by excluding lower-priced generic competition, with the goal of extracting monopoly profits at the expense of Daraprim customers.

12.     Absent Defendants' anticompetitive and deceptive conduct, multiple generic competitors would have entered the Daraprim market sooner and at lower prices, rendering Defendants' price hike unsustainable—such that they would not have pursued it in the first place.

13.     By instead planning to thwart generic entry from the start, Defendants determined they could impose monopoly prices and reap significant profits at the expense of Plaintiff and Class members, who were forced to pay inflated prices in violation of the federal antitrust laws, various state antitrust and consumer protection laws, and the common law of unjust enrichment.

## II.     Jurisdiction and Venue

14.     This Court has jurisdiction over the subject matter of this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, because this is a class action in which the matter or controversy exceeds $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from some Defendants. This Court's exercise of supplemental jurisdiction over Plaintiff's state law claims would avoid unnecessary duplication and multiplicity of actions, and should be exercised in the interests of judicial economy, convenience, and fairness.

15.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

16.     This Court has personal jurisdiction over Defendants because each has the requisite constitutional contacts with the state of New York due to their domicile, extent of their business transactions within New York, contracts to supply goods and services in New York, soliciting business in New York, and/or committing illegal acts as alleged herein within the state of New York, pursuant to N.Y. C.P.L.R. §§301, 302.

17.     The Federal Trade Commission ("FTC") along with the Attorneys General of California, Illinois, North Carolina, New York, Ohio, Pennsylvania, and Virginia have initiated an

enforcement action in this District against Defendants for the conduct alleged herein. *See FTC v. Vyera Pharma, LLC*, No. 1:20-cv-0706 (S.D.N.Y). The amended complaint in that action is referred to herein as the "Government Complaint."

## III.    The Parties

### A.    Plaintiff

18.    Plaintiff Blue Cross of Minnesota is a non-profit health service plan corporation organized under the laws of Minnesota with its principal place of business in Minnesota. During the Class Period, Defendants' anticompetitive and deceptive conduct caused Plaintiff to pay for and/or reimburse purchases of Daraprim at artificially inflated prices.

### B.    Defendants

19.    Defendant Vyera Pharmaceuticals, LLC, ("Vyera") is a privately-held, for-profit limited liability corporation incorporated in Delaware with its principal place of business in New York, New York. Vyera is a wholly owned subsidiary of Phoenixus AG. Vyera is registered with the FDA as the owner of the Daraprim New Drug Application (No. 008578). Vyera was formerly known as Turing Pharmaceuticals LLC. Vyera purchases Daraprim from Phoenixus and then markets and distributes the product throughout the United States, including in this District.

20.    Defendant Phoenixus AG ("Phoenixus") is a privately-held, for-profit Swiss corporation with its principal place of business in Baar, Switzerland. Phoenixus is engaged in the manufacture and distribution of Daraprim. Phoenixus acquired the rights to market and distribute Daraprim in the United States in August 2015 and designated Vyera as the exclusive U.S. distributor. Phoenixus is responsible for the manufacture and warehousing of Daraprim and sells the product to Vyera for distribution in the United States, including in this District.

21.     Defendants Phoenixus and Vyera have operated and continue to operate as a common enterprise while engaging in the illegal acts alleged below. Defendants have engaged in this conduct as interrelated companies that share directors, officers, employees, business functions, and office locations. Phoenixus has only five direct employees and largely operates through Vyera, which has more than 50 employees. The current CEO of Phoenixus, Averill Powers, is also Vyera's top executive and general counsel and works out of Vyera's New York office. Phoenixus's few Switzerland-based employees perform functions for Vyera. Phoenixus's board of directors controls Vyera, which has no board. Vyera accounts for a substantial percentage of Phoenixus's revenues. Unless otherwise specified, this Complaint refers to Vyera and Phoenixus collectively as "Vyera" when discussing their joint conduct relating to Daraprim.

22.     Defendant Martin Shkreli ("Shkreli") is the founder of Phoenixus and Vyera, the largest shareholder and former chairman of the board of Phoenixus, and the former CEO of Vyera. At all times material to this Complaint, acting alone or in concert with others, Shkreli has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Shkreli resided in this District until his federal incarceration for securities fraud in 2017. While incarcerated, Defendant Shkreli has continued to direct Defendants' operations, communicating with Vyera executives and Phoenixus's board of directors, including Defendant Mulleady, via a contraband cellphone and email and telephone services managed by the Bureau of Prisons. In connection with the conduct alleged herein, he transacts or has transacted business in this District and throughout the United States.

23.     Defendant Kevin Mulleady ("Mulleady") is the current chairman of the Phoenixus board of directors and former CEO of Vyera. At all times material to this Complaint (with the exception of a brief period from early 2016 until June 2017), acting alone or in concert with others,

he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Mulleady resides in this District and, in connection with the matters alleged herein, he transacts or has transacted business in this District.

## IV.    Interstate Trade and Commerce

24.    From August 7, 2015 through at least March 2020, Defendants were the sole provider of Daraprim in the United States. At all material times, Defendants manufactured and sold Daraprim, directly or through one or more of their affiliates, throughout the United States and in this District, in a continuous and uninterrupted flow through interstate commerce.

25.    By inflating, maintaining, or artificially stabilizing the price for Daraprim, Defendants deprived purchasers of Daraprim of the benefit of free and open competition, and thus had a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States, as well as intrastate commerce within each state.

26.    Such effects, including the inflated prices that Plaintiff and members of the proposed Classes paid for Daraprim during the Class Period, caused antitrust injury in the United States, and give rise to Plaintiff's antitrust and consumer protection claims, and claims for unjust enrichment.

## V.    Regulatory Framework

27.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. §§ 355(b)(2) and 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to facilitate competition from lower-priced generic drugs.

28.     When a generic drug first comes to market, it typically is sold at a 20 to 30 percent discount to the branded product. As additional generic products come to market, price competition drives generic prices down to as low as 85 to 90 percent below the brand price, typically in a short timeframe.

29.     Because of these lower prices, patients and end-payers often seek to substitute AB-rated generic drugs for their branded counterparts. All 50 states and the District of Columbia have drug substitution laws that encourage and facilitate generic substitution. As a result, AB-rated generic drugs typically capture over 80% of a branded drug's sales within the first six months of entering the market.

30.     To market a new, brand-name drug in the United States, a company must file a New Drug Application ("NDA") with the FDA demonstrating that the new product is safe and effective.

31.     A company seeking to market a generic version of an approved branded drug may file an Abbreviated New Drug Application ("ANDA") with the FDA, referencing the NDA for the branded drug. The ANDA applicant is required to show that its generic product is therapeutically equivalent to the reference drug. If the FDA agrees that two drugs are therapeutically equivalent, it will assign the generic drug an "AB" rating and will allow the generic company to rely on the studies submitted with the reference drug's NDA to establish that the generic is safe and effective. 21 U.S.C. § 355(j)(2)(A)(iv).

32.     To establish that the generic drug is therapeutically equivalent to the branded drug, the ANDA applicant must demonstrate "bioequivalence," meaning there is no significant difference in the rate and extent to which the drug's active ingredient becomes available in the body. To perform the bioequivalence testing needed to satisfy this requirement, the applicant must acquire substantial samples of the branded drug.

33.     The ANDA applicant must conduct both in vivo and in vitro bioequivalence testing. For in vivo testing, human subjects sequentially take the two products and the drug's pharmacokinetic performance is measured through bloodwork. The in vitro testing compares the rate and extent to which the branded and generic drugs form a solution from their original dosage form (e.g., tablet or capsule) when dissolved.

34.     The ANDA applicant must perform each of the required tests five times, which requires it to obtain substantial quantities of the branded drug. A generic manufacturer may need up to 5,000 doses of the branded drug to conduct bioequivalence testing, and all of the samples must come from the same manufacturing lot to assure uniform character and quality. It is the standard practice in the pharmaceutical industry for ANDA applicants to obtain the necessary samples through normal, commercial distribution channels.

35.     In addition to samples, ANDA applicants must also have access to an approved source of the drug's API, the essential ingredient that makes the drug effective for its approved use. Generic drug manufacturers typically acquire API from specialty third-party suppliers. An API may be used in a pharmaceutical product only if the FDA has separately approved the API product itself, the API manufacturing process, and the API manufacturer's facility, quality controls, and compliance with good manufacturing practices. Therefore, an ANDA must include extensive information about the API and its manufacturer, including a complete description of the manufacturing process and quality controls. The FDA reviews this information in detail and usually will audit the API manufacturer and its facility regardless of location.

36.     An ANDA applicant can bypass much of this time-consuming and expensive process by purchasing API from a supplier whose Drug Master File ("DMF") the FDA already has approved. An ANDA applicant intending to use that supplier can reference the DMF in its ANDA,

thus avoiding the expense and delay of working with a new supplier to obtain FDA approval of its API manufacturing process.

## VI.    Factual Allegations

### A.    Toxoplasmosis and Daraprim

37.    Toxoplasmosis is a disease that results from infection with the toxoplasma gondii parasite, typically transmitted through undercooked meat, infected cat feces, or exposure to infected animals or birds. Most people are able to stave off toxoplasmosis by their own immune systems. In many cases, the disease is asymptomatic.

38.    Yet for people with compromised immune systems—namely those with HIV/AIDS, cancer patients, and recipients of organ transplants—toxoplasmosis can lead to potentially fatal infections of the brain, lungs, heart, and other organs. Additionally, a pregnant mother can pass on the toxoplasma gondii parasite in utero, causing congenital toxoplasmosis, which left untreated can lead to blindness, severe intellectual disabilities, and other neurological problems in children.

39.    The number of toxoplasmosis cases requiring treatment each year in the U.S. is relatively small—less than 7,000 per year from 2003-2012. Those numbers have declined as the treatment of HIV/AIDS has improved.

40.    Pyrimethamine is the preferred treatment for toxoplasmosis and has been endorsed by the Centers for Disease Control and Prevention, the National Institute of Health, and the World Health Organization. Other, non-pyrimethamine pharmaceutical products are not regarded as reasonable substitutes for pyrimethamine, which is considered the "gold standard" treatment. Guidelines from U.S. government health authorities identify pyrimethamine as "the most effective drug against toxoplasmosis" and advise using other options only when pyrimethamine is

"unavailable or there is a delay in obtaining it." Many doctors are "at a loss to think of an appropriate alternative to pyrimethamine."

41.     Non-FDA-approved     pyrimethamine     products,     such     as     compounded pyrimethamine, are not appropriate substitutes for FDA-approved pyrimethamine either. Most doctors have serious safety concerns about compounded products because they are not FDA approved and have not been proven safe and effective. Additionally, federal law imposes significant restrictions on how compounded pharmaceuticals are sold, which restricts their availability to patients.

42.     Toxoplasmosis is typically diagnosed in hospitals, where patients often remain hospitalized for two to three weeks. Daraprim is available only as a 25-milligram tablet. The initial starting dosage for adults is 50 to 75 milligrams, or two to three tablets, per day. Toxoplasmosis patients typically continue to take pyrimethamine at half-dosage for a few weeks after being discharged, though some patients must remain on pyrimethamine indefinitely to prevent recurrence.

43.     The FDA first approved a branded version of pyrimethamine, Daraprim, in 1953. From its approval until 2010, GSK and its predecessors owned the worldwide rights to Daraprim, which has long since lost any patent or regulatory protections.

44.     In 2010, GSK sold its U.S. and Canadian Daraprim rights to CorePharma LLC, which then transferred the product to its sister company, Amedra Pharmaceuticals LLC. At the time, GSK was selling Daraprim for around $1 per tablet, which generated annual revenues of less than $1 million. GSK still sells Daraprim in the United Kingdom, where it charges less than $1 per tablet. CorePharma and Amedra gradually increased Daraprim's price to $13.50 per tablet.

45.     In March 2015, Impax Laboratories, Inc. acquired the rights to Daraprim as part of its acquisition of Amedra's parent company. Impax increased Daraprim's price to $17.50 per tablet, but rejected a more aggressive price increase because of its potential impact on the HIV-AIDS community.

**B.     Vyera's Acquisition of Daraprim and Its Plan to Monopolize the Daraprim (Pyrimethamine) Market**

46.     Vyera was founded in 2014 with a specific scheme in mind: to acquire a pharmaceutical drug, grossly inflate its price, and insulate it from price competition to extract monopoly profits. The goal of this scheme, in the words of the U.S. Senate Special Committee on Aging, was to "exercise de facto monopoly pricing power, and then impose and protect astronomical price increases."

47.     To do so, Vyera searched for a sole-source drug like Daraprim that it could withhold from competitors through a restricted distribution system. Vyera also began searching for distributors that would "help [it] keep a tightly controlled supply chain, where [the] drug is only supplied to verified patients."

48.     In April 2015, Vyera offered to purchase the U.S. rights to Daraprim from Impax, which assessed Daraprim's net present value at $17.1 million, assuming no generic entry. After months of negotiations, Vyera acquired the U.S. rights to Daraprim for $55 million in August 2015—more than three times Impax's assessed net present value and more than eleven times Daraprim's annual net revenues at the time.

49.     Vyera was willing to pay this premium because, from the start, it planned to transform Daraprim into an ultra-expensive, immensely profitable drug by unlawfully shielding it from price competition. As an initial step in its scheme, Vyera increased the price per tablet of

Daraprim from $17.50 to $750 the day after it closed the deal—an astronomical increase of more than 4,000%.

50.     Shkreli, Vyera's then-CEO, believed that "nobody will notice and there will not be any consequence." In fact, the opposite occurred: patients, health care providers, scholars, and lawmakers roundly denounced Vyera's price increase, generating a swift backlash. The HIV Medicine Association of the Infectious Diseases Society of America condemned the price increase as "unjustifiable for the medically vulnerable patient population in need of this medication and unsustainable for the health care system" generally. Even Vyera's former general counsel described the price increase as "not justifiable" and "unethical."

51.     Defendants would not have imposed the price increase—because they knew that such a breathtaking price increase would be unsustainable—unless they could block generic competition. Because Daraprim's patent protection had expired decades earlier, Defendants rightly feared that generic companies would enter the market in response to the price increase and offer generic pyrimethamine at lower prices.

52.     To cover their tracks, Defendants assured the public that they welcomed generic competition. Defendants explained that their goal was to expand, not limit, the availability of toxoplasmosis treatments and that generic companies would still have access to Daraprim. Defendants further claimed that they purchased and raised the price of Daraprim to benefit patients and to save the drug from "being put out of business." As such, Defendants pledged to put all profits from Daraprim "back in the patients' hands" by investing in research for better treatments for toxoplasmosis, while easing the distribution restrictions they inherited from Impax.

53.     All of these claims were false, fraudulent, and purposefully deceptive. In reality, Defendants schemed to enrich themselves and maintain their monopoly by preventing generic

competition. Defendants constructed a web of agreements at virtually every level of the distribution chain to impede competitors from developing generic Daraprim. This included: (1) prohibiting distributors and downstream purchasers from reselling Daraprim to generic companies; (2) exclusive supply contracts with API manufacturers that denied potential generic competitors access to pyrimethamine; and (3) data-blocking agreements that prevented distributors from selling the Daraprim sales data that would have helped generic competitors assess a generic product's commercial viability.

## VII.   Defendants' Anticompetitive Conduct

### A.   Defendants Prohibit Resale of Daraprim to Block Generic Entry

54.   For more than 60 years, Daraprim had been distributed openly and without restrictions in the United States. This meant that a generic company could purchase Daraprim at a local pharmacy without having to negotiate contracts or receive special approval.

55.   Defendants understood that if they sharply raised the price of Daraprim, competitors could obtain the samples they needed to develop a generic product. Defendants therefore sought to cut off that access by subjecting Daraprim to a tightly restricted distribution system, one that went far beyond what Vyera inherited from Impax, and which was fundamental to their plan to increase Daraprim's price.

56.   This was not the first time Shkreli had used resale restrictions to block generic competition. In 2014, Shkreli directed his first pharmaceutical company, Retrophin Inc., to acquire the rights to another rare drug, Thiola, raise its price by 2,000 percent, and impose a restricted distribution system. Shkreli explained to Retrophin's investors that "[t]he closed distribution system . . . allows for us to control the release of our product. We do not sell Retrophin products

to generic companies." In Shkreli's words, cutting-off generic companies' access to drug samples "takes the AB substitutable rating that generics rely on and neuters it."

57.     Once at Vyera, Defendant Mulleady stated privately that Vyera's "#1 priority" would be establishing a similar restricted distribution system for Daraprim; doing so was "exceptionally time sensitive;" and that Vyera employees should "work extra long hours to get this done."

58.     Vyera covertly executed this plan once it acquired Daraprim. Vyera expanded the number of distributors for logistical reasons and imposed aggressive new resale restrictions that barred distributors, hospitals, and pharmacies from reselling Daraprim to generic companies. This prevented generic companies from purchasing Daraprim at any point in the distribution chain, and thus blocked them from performing the bioequivalence testing required for FDA approval. Defendants meanwhile engaged in a deceptive public relations campaign to conceal their actions.

### 1.     Vyera prohibits distributors from selling Daraprim to generic companies

59.     To prevent generic companies from obtaining the samples necessary for bioequivalence testing, Vyera's distribution agreements only allow distributors to sell Daraprim to specifically identified customers or customer types. To sell Daraprim to anyone else, multiple levels of distributors need Vyera's express approval. If a distributor receives an order from a suspected generic company or its agent, Vyera will "block that purchase" to "avoid generic competition."

60.     Vyera's distribution system begins when its contract manufacturer delivers Daraprim to Vyera's third-party logistics provider ICS (formerly Smith Medical Partners). ICS then warehouses the Daraprim and ships it to Vyera's authorized distributors. Vyera's agreement with ICS allows ICS to ship Daraprim only to four distributors: ASD Healthcare, BioRidge

Pharma, LLC, Optime Care Inc., and, upon information and belief, Cardinal Health. ICS is prohibited from selling Daraprim to other distributors without Vyera's express approval.

61.     Each of the four authorized distributors that obtain Daraprim from ICS may then only sell Daraprim to specific types of purchasers. Vyera contracts with ASD Healthcare to distribute Daraprim to hospital and government purchasers; with BioRidge Pharma to distribute Daraprim to certain identified specialty pharmacies; with Optime Care to distribute Daraprim only to "[a]uthorized customer types," like hospitals, government customers, state AIDS Drug Assistance Programs, and patients with a prescription; and with a fourth distributor, upon information and belief, Cardinal Health, to "approved classes of trade," which are defined as "[h]ospitals, state AIDS Drug Assistance Programs (ADAPs), and their authorized purchasers."

62.     Each of these distribution agreements prohibits Vyera's distributors from selling Daraprim to generic companies without Vyera's express approval, which it never provides. Vyera has rejected every request from a distributor to sell Daraprim to a purchaser that it suspected might be a generic company or its agent, despite the fact that sales of Daraprim at list price would be profitable to Vyera. The purpose and effect of these distribution restrictions is to block generic companies from purchasing the Daraprim samples they need to perform the bioequivalence studies required by the FDA.

### 2.     Vyera prohibits downstream purchasers from selling Daraprim to generic companies

63.     Vyera also took steps to ensure that downstream purchasers, like hospitals and pharmacies, did not sell Daraprim to any generic competitors. To prevent such resales, Vyera required distributors to obtain their own customers' agreement not to resell Daraprim to generic companies.

64.     As one example, Vyera permitted ICS to sell Daraprim to a group of Puerto Rican pharmacies in September 2015, but required ICS to "provide some wording on the account prohibiting sale of daraprim to a third party." Vyera further directed that the "[p]roduct should only be dispensed to patients in their facilities"—thus preventing any sales to generic companies.

65.     In another instance in May 2018, Vyera directed Optime to include a provision in its agreements with hospitals requiring them to guarantee that Daraprim "will not be sold, resold, diverted or transferred to any other person or entity for any reason unless approved in writing by Vyera or its designee." This too prevented any sales to generic companies.

66.     Vyera included similar resale instructions in its direct agreements with hospitals and pharmacies. Vyera's agreements with hospitals require them to use Daraprim only for their "own use," which is defined as the treatment of the hospital's patients. Vyera includes similar provisions in its agreements with hospital group purchasing organizations, or "GPOs." Vyera's contract with the GPO Vizient, for example, states that Vizient's member hospitals can only purchase Daraprim for "the use of the Member" and "not for resale to anyone other than the end use patient or customer." These restrictions once again prevent the resale of Daraprim to generic companies.

67.     So too do Vyera's contracts with Walgreens, which sells Daraprim through its specialty pharmacies. Under its contracts with Vyera, Walgreens may provide Daraprim only to two recipients: its specialty pharmacies and patients with a prescription. Walgreens and its specialty pharmacies are prohibited from selling Daraprim to generic companies without Vyera's approval.

68.     Much like its distributor agreements, Vyera's restrictions on downstream purchasers prevent them from selling Daraprim to any generic company seeking to conduct FDA-

mandated bioequivalence testing. The sole exception would be if Vyera approved such a sale, which it never has.

### 3.      Vyera monitors and aggressively limits sales of Daraprim

69.      On top of restricting to whom its distributors and downstream customers can sell Daraprim, Defendants have also restricted the quantities of Daraprim they could sell, so as to further prevent generic companies from obtaining the quantities they needed to conduct FDA-required bioequivalence testing.

70.      To conduct bioequivalence testing, a generic competitor would need a minimum of 500 to 1,000 Daraprim tablets, or five to ten Daraprim 100 tablet bottles. Vyera therefore limited the amount of Daraprim that any one approved entity could purchase, creating an additional barrier to prevent such testing.

71.      The explicit goal of these restrictions, according to one Vyera senior director, was to reduce the risk "that a Generic Competitor Could access multiple bottles of [Daraprim], perhaps obtained through a hospital reselling it or distributing product to surrounding retail pharmacies." Thus, even if a generic competitor managed to overcome the multiple levels of Vyera's resale restrictions, it would still be unlikely to acquire enough Daraprim to conduct bioequivalence testing.

72.      Vyera and ICS agreed to one example of such quantity restrictions in August of 2015—specifically, that ICS would not sell more than five bottles to a single customer without Vyera's express approval, so as to "ensure that the account is legit and not a generics manufacturer."

73.      Likewise, Vyera and Optime's 2018 contract requires Optime to obtain Vyera's express approval to sell more than three bottles to any purchaser. Vyera will not approve any sales

in excess of the three-bottle limit unless Optime obtains "prescription level information" on the purchase, such as the prescriber and prescription quantity—information that Vyera then uses to confirm that the purchaser is not affiliated with a generic company.

74.     Also in 2018, Vyera prevented the pharmacy Drug Mart from carrying more than one bottle of Daraprim in inventory at a time.

75.     In August 2019, Shkreli proposed further one-bottle sales limits during discussions with Mulleady and Akeel Mithani, a Vyera executive and senior vice president. Shkreli urged Mulleady to "really carefully screen every doctor" and ensure that no one could "sell more than one bottle at a time" to prevent a generic company from "get[ting its] hands on anything." In separate discussions with Mithani, Shkreli said Vyera should "do everything" possible to prevent a generic company from obtaining samples of Daraprim, because maintaining its monopoly would render Daraprim a "$600 million asset . . . in perpetuity."

76.     Mulleady also felt Vyera's resale restrictions needed tightening because he feared there had been "leakage" to a generic competitor. He requested a "full out audit of daraprim" in September 2017 so he could "know where every bottle of daraprim we sold went to." Under Mithani's direction, Vyera implemented a joint notification system with ASD, one of Vyera's main hospital distributors, which would immediately notify Vyera of any Daraprim orders. Its objective was to locate, and block, any "outlier" purchases that might have come from a generic company. If outliers were flagged, Mulleady and Mithani would contact the purchaser to "inquire as to what their purpose is."

77.     This aggressive monitoring helped Vyera quickly repossess Daraprim that might have been sold to a generic company. With ASD's assistance, in April 2018, Vyera intervened after a company called Centrastate Specialty Script purchased five bottles of Daraprim, despite

never having previously purchased more than two bottles at a time. Mithani feared that Centrastate had purchased the bottles on a generic company's behalf, and Mulleady instructed Vyera to buy back all five bottles. The repurchase agreement required Centrastate "not to purchase, directly or indirectly . . . any Daraprim, except directly through Vyera." Vyera then forbade ASD from selling Daraprim to Centrastate.

> ### 4. There is no legitimate business rationale for Defendants' resale restrictions

78.    Vyera's resale restrictions, quantity limits, and downstream monitoring each share the same goal and effect: preventing generic competitors from obtaining enough Daraprim samples to perform the bioequivalence testing required for FDA approval.

79.    These restrictions are difficult to bypass; they prevent generic companies from purchasing Daraprim at any point in Vyera's distribution chain. And even if a generic company found a way to circumvent them, Vyera's quantity limits and monitoring ensure that it is unlikely to obtain enough Daraprim to conduct bioequivalence testing.

80.    Nor can a generic company simply purchase Daraprim from a doctor, as doctors cannot lawfully prescribe medication for use in bioequivalence testing.

81.    Furthermore, even if a Generic Competitor Could collect sufficient quantities of Daraprim for testing, all bottles would still need to come from the same manufacturing lot, as required by the FDA. Vyera's restrictions effectively prevent that.

82.    Contrary to Defendants' deceptive claims, Vyera's resale and quantity restrictions do not have any legitimate business rationale or pro-competitive justification. They are not related to any safety concerns or patient services, and the FDA has never required sellers to place Daraprim into any safety program, such as by implementing Risk Evaluation and Mitigation Strategies (REMS). To the contrary, Vyera's restrictions have disrupted patients' access to

Daraprim, causing a wide-range of health complications. Indeed, Vyera initially rejected expanding its patient services program because doing so would "take forever."

**B.    Defendants Entered Into Exclusive Agreements to Block Generic Access to API**

83.    To further ensure that generic companies could not launch a competing product, Defendants entered into exclusive supply agreements with the two most viable manufacturers of pyrimethamine, the API used in Daraprim. This frustrated generic companies' efforts to secure a reliable source of pyrimethamine, which is necessary to launch a generic product.

84.    Before API may be used in a pharmaceutical drug, the FDA must approve an API manufacturer's facilities, process, and product. Rather than beginning this approval process anew for each new generic drug—which would involve substantial time and expenses, and risks failing to obtain FDA approval—it is more efficient and less expensive to source API from a manufacturer that is already approved by the FDA, or is a good candidate for FDA approval in that its manufacturing practices already satisfy FDA standards.

85.    To identify viable API manufacturers, generic companies often search for DMFs. A DMF is a submission from an API manufacturer to the FDA providing detailed information about the manufacturer's facility and process for a given API. By filing a DMF for a given API, a manufacturer indicates that it believes its manufacturing process meets the FDA's standards. Sourcing API from a DMF holder diminishes a company's "execution risk," as Vyera's director of business development acknowledged. This makes it easier for generics to come to market.

86.    To thwart generic entry, Defendants sought to cut off generic competitors' access to the manufacturers of pyrimethamine API that had an FDA-approvable manufacturing process— particularly those who had submitted DMFs. By locking those manufacturers into lucrative exclusive supply agreements, Defendants forced generic competitors to work with less established

API manufacturers, causing them substantial additional costs and delay, to the extent they continued to develop generic Daraprim at all.

### 1. Vyera enters into an exclusive agreement with Fukuzyu

87.     In mid-2015, only two pyrimethamine suppliers had filed DMFs with the FDA: Fukuzyu and Ipca Laboratories Ltd. With the goal of thwarting generic entry, Vyera contacted both suppliers before purchasing Daraprim to discuss whether they would agree to supply pyrimethamine API exclusively to Vyera.

88.     Ipca responded that it could not supply pyrimethamine in the U.S. because of an import ban. Vyera understood that this meant Ipca would be unable to provide API to generic companies, and assured investors that the import ban would cause "significant disruption" and delay generic competition.

89.     Vyera's initial attempts to reach an exclusive supply agreement with Fukuzyu—the only remaining FDA-approved pyrimethamine API manufacturer—were rejected. However, Vyera persisted, knowing an agreement with Fukuzyu was critical to stopping generic competition.

90.     Vyera explained its anticompetitive aims during private negotiations. Vyera told Fukuzyu that the "most critical issue[]" was obtaining an exclusivity provision that would prevent Fukuzyu from selling pyrimethamine to Vyera's generic competitors. Vyera explained that "[i]f generic products are put on the U.S. market, [Vyera] will face a serious problem, and may eventually terminate the marketing of Daraprim." Vyera emphasized that if a generic Daraprim launched, it could prevent Vyera from dealing with Fukuzyu in the future.

91.     On or about November 22, 2016, Fukuzyu and Vyera reached an oral agreement for the exclusive supply of Fukuzyu API for human use in the United States. Announcing the deal to co-workers, a Vyera executive did not hide its anti-competitive goals: "Fukuzyu has accepted

our agreement to provide pyrimethamine exclusively for us for human drugs and will not sell to generic manufacturers. This is a big sigh of relief for us!"

92.     The resulting contract that Vyera and Fukuzyu executed forbids Fukuzyu from selling pyrimethamine to anyone other than Vyera for human use in the United States—thus preventing it from supplying would-be generic competitors.

93.     As required under the contract, Fukuzyu has worked closely with Vyera to ensure that it does not sell API in a manner that would violate the exclusivity provision, while Vyera has regularly directed Fukuzyu not to supply API to potential generic competitors, such as those seeking to use pyrimethamine for human use in the U.S.

94.     Upon information and belief, at least two potential generic competitors have attempted to purchase API from Fukuzyu, but have been denied due to Vyera's exclusive supply agreement.

95.     Vyera's exclusive supply arrangement with Fukuzyu does not have any legitimate business rationale or pro-competitive justification. It does not ensure that Vyera is supplied with pyrimethamine because Fukuzyu is not required to reserve any volume for Vyera and can sell any amount to buyers outside the U.S. (or for non-human use within the U.S.). Vyera and Fukuzyu's exclusivity agreement similarly does not recoup any investment Vyera made in Fukuzyu. Its sole purpose is to prevent potential generic competition.

96.     Through at least April 2020, the 2017 exclusive supply agreement with Fukuzyu remained in effect and may continue to be operative.

**2.     Vyera enters into an exclusive agreement with RL Fine**

97.     Once it had exclusivity with Fukuzyu, Vyera signed another exclusive supply agreement with RL Fine—the next most viable manufacturer of pyrimethamine API—because without exclusivity, RL Fine threatened to undermine Vyera's anticompetitive scheme.

98.     In August 2017, Vyera learned that RL Fine was planning to submit a DMF for pyrimethamine API as part of its work with two generic companies. This posed a threat to Defendants' monopoly because RL Fine was a likely candidate for FDA approval and might soon supply pyrimethamine API to generic competitors. RL Fine already had established a pyrimethamine manufacturing process, had filed a European DMF, and was experienced in manufacturing and selling pyrimethamine in Europe. All indications were that RL Fine would likely satisfy FDA standards, making it the next-best option for generic competitors seeking to launch a generic Daraprim product in the U.S.

99.     Defendants' initial attempts to obtain an exclusivity arrangement with RL Fine were rebuffed. But, as with Fukuzyu, Mulleady and Shkreli continued to push, recognizing RL Fine's importance to Defendants' scheme. In December 2017, Mulleady (then serving as Vyera CEO and Phoenixus' board chairman) executed two contracts with RL Fine on behalf of Phoenixus: a product collaboration agreement and a distribution and supply agreement.

100.    The product collaboration agreement provided that Vyera and RL Fine would collaboratively develop certain products; however, neither company ever did.

101.    The distribution and supply agreement designated Vyera as RL Fine's exclusive distributor of pyrimethamine API worldwide, even though Vyera has no API distribution capabilities and no intention of becoming an API distributor. Nonetheless, this exclusivity empowered Vyera to block RL Fine from making any pyrimethamine API sales outside of India,

such as to would-be generic competitors in the United States. Upon information and belief, Vyera has used its authority to direct RL Fine to cease supplying pyrimethamine API to the two generic companies with which it had been working. Indeed, RL Fine has not supplied pyrimethamine to any company for use in the United States since signing its exclusive supply agreement with Vyera.

102.    In return for its exclusivity, Vyera has made monthly payments to RL Fine from February 2018 through at least August 2019. Vyera's payments do not hinge on whether it receives any API from RL Fine, or whether such API is approved for use in Vyera's Daraprim. In fact, as of April 2020, Vyera had not received any API from RL Fine.

103.    There is no legitimate business rationale or pro-competitive justification for Vyera and RL Fine's exclusivity agreement. Vyera did not need, and was not seeking, an additional source of pyrimethamine API because Fukuzyu has reliably supplied Vyera with more API than it can use.

104.    The purpose of Vyera's agreement with RL Fine is not to support its own supply chain, but rather to ensure that RL Fine does not supply any potential generic competitors. This is clear because Vyera cannot legally use RL Fine's pyrimethamine API in Daraprim because neither party has sought or obtained FDA approval. Moreover, in contrast to the diligence Vyera performed when negotiating its exclusive supply agreement with Fukuzyu, Vyera negotiated its agreement with RL Fine without conducting any technical diligence into RL Fine's production capabilities. As recently as September 2019, Vyera's own chief scientific officer responsible for Daraprim did not even know that Vyera had a contract with RL Fine.

105.    Vyera paid RL Fine to end the agreement in late 2019, after the FTC opened an investigation into the agreement.

106.    As a result of Vyera's exclusive supply agreements with RL Fine and Fukuzyu, potential manufacturers of generic Daraprim products were unable to procure pyrimethamine API from the two most viable API suppliers. This blocked Vyera's potential generic competitors from sourcing pyrimethamine API and significantly delayed generic competition.

### C.    Vyera Imposes Data-Blocking Agreements on Its Distributors

107.    Vyera also hindered potential competitors' ability to evaluate the commercial viability of generic Daraprim by imposing data-blocking agreements on its primary distributors, thereby further deterring generic competition.

108.    Ordinarily, generic companies will analyze sales data for branded products to determine the commercial value of a proposed generic drug. Companies such as IQVIA and Wolters Kluwer purchase sales data from pharmaceutical wholesalers and retailers and resell it in aggregate form to manufacturers and other industry participants. Generic companies rely on this data in order to determine whether to develop generic drug products.

109.    Because Vyera is privately held, it does not disclose its Daraprim sales data. Therefore, potential generic competitors must rely on commercial sales data from third-party data reporting companies.

110.    Vyera was concerned that if Daraprim's supra-competitive sales figures were accurately reported, they would induce generic competitors to enter the market. Therefore, it set out to preclude its distributors from selling Daraprim sales information to third-party data companies.

111.    To execute this strategy, Vyera paid its distributors a "data blocking fee" in return for their agreement not to sell data to third-party data reporting companies. For example, in 2017 Vyera committed to paying a monthly fee to ASD in exchange for ASD's promise not to sell

Daraprim sales data to data-reporting companies. Vyera entered into a similar data-blocking agreement with another major distributor.

112.     Vyera's data-blocking scheme may have been too successful. In 2018, the FDA became concerned that nationwide sales of Daraprim appeared to be extremely low. The FDA contacted Vyera to enquire whether Daraprim was in short supply. An investigation by Vyera's own staff led them to conclude that the FDA's concerns likely had been prompted by "the business decision [Vyera] made to block dispense/sales data reported by [its] distribution partners."

113.     Vyera intended its data-blocking restrictions to obscure the size of the Daraprim market to make it less attractive to generic competitors. It succeeded. Upon information and belief, as a result of the data-blocking scheme, at least one potential generic competitor decided not to develop a generic Daraprim product.

114.     There is no legitimate business reason for Vyera's imposition of data-blocking agreements on its major distributors. As a private company, Vyera is under no obligation to disclose its own sales data. But prior to paying what amounted to a bribe, ASD and the other distributors routinely sold their Daraprim sales data to third-party data reporting companies in the ordinary course of their business. Vyera's unorthodox data-blocking agreements had no purpose other than to conceal the extent of Daraprim sales from potential generic competitors.

## VIII.   Defendants Conceal Their Anticompetitive Conduct through Deception and Fraud.

115.     Defendants' 4,000%-plus price increase on Daraprim generated outcry and raised public scrutiny of Defendants' business practices. In response, Defendants launched a media campaign to conceal their scheme by repeatedly lying about their anticompetitive conduct, which was still largely unknown at the time.

116. Among other things, Defendants misrepresented their efforts to exclude generic competition, the ability of generic companies to purchase Daraprim, the exclusionary nature and extent of Vyera's sale restrictions, the anticompetitive reason Vyera acquired Daraprim in the first place, the profit-motive behind the price increase, and the resources Vyera was expending to maintain its monopoly vs. developing new toxoplasmosis treatments.

117. While a few facts surrounding Defendants' scheme were publicly known at the time—such as the price increase itself and the fact that Vyera inherited certain distribution restrictions from Impax—Defendants concealed and misrepresented virtually all of the anticompetitive conduct challenged in this Complaint.

118. Defendants' deception began soon after the initial price increase. During a televised interview with *Bloomberg* on September 21, 2015, Shkreli was asked whether the price increase would cause "other drug companies . . . [to] make generic versions of [Daraprim] and [] sell it for cheaper." In response, Shkreli claimed he welcomed generic competition, saying, "Sure, and I think that's a great thing." Shkreli then suggested that the goal of the price increase was to spur innovation and competition by showing "companies that [taxoplasmois can] actually generat[e] a profit," and that Vyera was already "spending tens of millions of dollars to make a better version of Daraprim." Shkreli further pledged to take the profits that Vyera made from Daraprim and "put it back in the patients' hands."

119. Two days later, during an online panel hosted by *MedCity News* on September 23, 2015, Shkreli again falsely claimed that Defendants would not retain any profits from Daraprim. Shkreli claimed that new $750 price per tablet reflected Daraprim's "break-even price" and that Vyera was "committ[ed] to take any profits we have and put it back into research to make a better version of [Daraprim]."

120.   Shkreli made similar misrepresentations on September 22, 2015 during an interview on *CBS This Morning*. Shkreli claimed that "with these new profits [from Daraprim], we can spend all of that upside on [toxoplasmosis] patients who sorely need a new drug" because Vyera's "first and primary stakeholder is patients." The same day, *The Washington Post* reported that Shkreli pledged that "all profits from [Daraprim] would be reinvested into research on making a better version of the drug."

121.   Shkreli continued to conceal Defendants' anticompetitive scheme during an October 23, 2015 interview on *Fox Business*. Shkreli claimed that Vyera purchased the rights to Daraprim not to monopolize the drug, but rather to save it from discontinuation because it "was in danger of being put out of business." When asked about other companies launching competing products, Shkreli again claimed that Vyera embraced competition, stating, "[T]here is competition, free markets, and capitalism, and for many people this [competition] is exactly what they wanted . . . I'm not too worried about our competition." After the interviewer stated she liked the idea of "a competitor coming in [because] that's the way markets work," Shkreli responded, "Me too."

122.   Shkreli repeated many of the same misrepresentations during a December 3, 2015 interview at *Forbes*'s Healthcare Summit. Shkreli was asked, "Why is Daraprim sold under a closed, restricted system. This is fairly key to your ability to maintain this price. What's the justification here?" In response, Shkreli denied that Vyera's closed distribution system—about which little was then known—was designed to shield Daraprim's price from competition. Instead, he claimed that the restrictions were meant to help patients, stating, "I think almost every very expensive drug is sold under closed distribution because it's such a complicated reimbursement process that it's better for the patient to not go to the pharmacy." Pressed further on whether the

closed distribution system was related to the price increase, Shkreli said, "Ha, ha, no. It's to help patients."

123.    Vyera's Chief Commercial Officer, Nancy Retzlaff also misrepresented Vyera's distribution restrictions during her testimony on February 4, 2016 before the House of Representatives' Committee on Oversight and Government Reform. Retzlaff claimed that Vyera merely inherited its distribution model from Impax and was not seeking to further restrict Daraprim's distribution. She testified that when "[Vyera] purchased Daraprim it was already in a closed distribution model, so we inherited that model from the previous manufacturer" and that "[a]ccess to Daraprim was a problem because of the distribution model we inherited from [Impax]."

124.    On March 17, 2016, Michael Smith, Vyera's Senior Director of Business Development, gave congressional testimony before the U.S. Senate Special Committee on Aging. Like Shkreli, Smith falsely claimed that Vyera's distribution restrictions—most of which were still unknown at the time—were intended to help patients and not impede competition. According to Smith, "[P]utting a product like Daraprim into a specialty pharmacy . . . leads to better patient outcomes."

125.    Smith further claimed—again, falsely—that Vyera was not seeking to withhold Daraprim from generic companies because generic companies still had access to Daraprim through most distribution channels. Smith testified, "The specialty channel that we sell through, we have control of that channel. We don't have control through, I believe, 60-70% of our product, by unit, that we sell out. . . . I'm not aware of any reason why, you know, a generic couldn't get access to that [product]." Smith also claimed that Vyera does not "have the ability to control access to [Daraprim] once it goes into [institutional] channels."

126.    All of the above statements by Defendants were false.

127.    Contrary to Defendants' claims, Defendants in fact imposed aggressive sale restrictions on all channels of Daraprim's distribution. Those restrictions went far beyond what Defendants inherited from Impax and were purposefully designed to prevent generic companies from acquiring Daraprim. None of Vyera's sale or distribution restrictions were meant to benefit patients.

128.    Nor was it true that Defendants welcomed or sought to incentivize competition, as they falsely claimed. Defendants' actual goal was the opposite: to avoid competition at all costs by tightly restricting who had access to Daraprim samples, pyrimethamine API, and relevant Daraprim sales data.

129.    Defendants' claims that they would not profit from Daraprim and that they were reinvesting "all profits" into toxoplasmosis research were also false and designed to conceal their monopolistic scheme. Not only have Defendants profited immensely from Daraprim, they diverted significant sums, which they had publicly pledged to research, to maintaining their monopoly, such as by purchasing expensive exclusive supply rights, bribing distributors to not report sales data, and repurchasing Daraprim that they suspected might be acquired by a generic competitor.

130.    Through their false and deceptive statements, Defendants misled the public about the existence and nature of their anticompetitive scheme and created the false impression that Defendants were engaged in fair and open competition that would expand access to Daraprim and help patients.

## IX.    Defendants' Anticompetitive and Deceptive Conduct Impeded Generic Competition

131.    Defendants' scheme succeeded as intended. Vyera's restraints on reselling Daraprim, its exclusive API supply agreements, and its data-blocking bribes—all of which

Defendants concealed—prevented or delayed at least four potential generic competitors, including Mylan, N.V. ("Mylan"), from entering the market. Upon information and belief, entry by a fifth company likely was impeded as well.[1]

### A.    Generic Competitor A

132.    Upon information and belief, Generic Competitor A was thwarted in its efforts to develop generic Daraprim because of Defendants' anticompetitive scheme. Attracted by the fact that Daraprim was off patent and faced no generic competition, Generic Competitor A decided to develop a generic product in 2013.

133.    To conduct the bioequivalence testing required by the FDA, Generic Competitor A needed to procure at least six bottles of branded Daraprim. This was before Vyera acquired the rights to Daraprim, which meant the drug was still available through ordinary distribution channels.

134.    In August 2013, Generic Competitor A purchased nine bottles of Daraprim from a New Jersey pharmacy, for a total cost of $10,350 (or $1,150 per 100-count bottle).

135.    Generic Competitor A had no difficulty buying this Daraprim. It went to a local pharmacy, ordered the bottles, and picked them up the following day. The pharmacy did not (and did not need to) contact Daraprim's then-manufacturer for permission to make the sale.

136.    Generic Competitor A decided to source its pyrimethamine API from Ipca, which already had a manufacturing process in place. After Generic Competitor A chose Ipca as its API supplier, Ipca submitted a DMF for pyrimethamine to the FDA.

---

[1] In this section, Plaintiff relies on facts alleged in the Government Complaint. For reasons of confidentiality, the names of three of the generic companies excluded from the market because of Defendants' conduct were redacted in the public record. To maintain that confidentiality, Plaintiff refers to those generic companies here as "Generic Competitor A," "Generic Competitor B," and "Generic Competitor C".

137.   For the rest of 2013 and into 2014, Generic Competitor A performed the bioequivalence testing required by the FDA, comparing its own product manufactured with Ipca API to the brand-name Daraprim it had procured from the New Jersey pharmacy. Generic Competitor A sent the results of these tests to the FDA in May 2014.

138.   At around the same time, the FDA identified certain deficiencies with Ipca's manufacturing plant in India, and banned Ipca from importing API to the United States pending resolution of those deficiencies. Ipca's deficiencies persisted through 2015, forcing Generic Competitor A to look for a new supplier of pyrimethamine API.

139.   Generic Competitor A then secured Fukuzyu as its pyrimethamine API supplier. Fukuzyu demanded, however, that Generic Competitor A purchase an initial lot of 50 kilograms of pyrimethamine for approximately $300,000 to $400,000. Generic Competitor A thought this demand was unreasonable—it needed only four kilograms of API at that stage. Nonetheless, it yielded to Fukuzyu's demand rather than face the delays associated with pursuing a non-DMF supplier.

140.   Yet Fukuzyu soon terminated any further supply. Around six months after Fukuzyu had agreed to supply API to Generic Competitor A, Fukuzyu pulled out of the agreement. This was around the time that Fukuzyu signed its exclusive supply agreement with Vyera, meaning that Fukuzyu was now precluded from providing pyrimethamine API to Generic Competitor A—or to any other generic manufacturer in the U.S.

141.   Generic Competitor A found another possible pyrimethamine API supplier in early 2016. Although this company did not have a pyrimethamine DMF in the U.S., it did have one in Europe and was supplying manufacturers in Asia and Europe. This made it likely that its European manufacturing process would be approved by the FDA.

142.    Generic Competitor A and the European API manufacturer signed a pyrimethamine API supply agreement in November 2016. The agreement provided for the supply of pyrimethamine API to Generic Competitor A until December 31, 2021, for purposes of both product development and commercial production.

143.    Just over a year later, however, Generic Competitor A was notified by the FDA that it would need to repeat its bioequivalence testing using the new pyrimethamine API obtained from its European supplier.

144.    This posed a problem: to repeat the testing, Generic Competitor A would need to procure at least another six 100-count bottles of branded Daraprim, but Vyera's resale restrictions blocked it from buying the Daraprim samples it needed.

145.    In December 2017, Generic Competitor A tried to buy Daraprim from the New Jersey pharmacy where it purchased its original lot in 2013. The pharmacy responded that it could not supply Generic Competitor A because Daraprim was no longer available from wholesalers.

146.    A few weeks later, in January 2018, Generic Competitor A tried to buy Daraprim from a hospital pharmacy in California. But the pharmacy was also unable to obtain Daraprim for Generic Competitor A from its usual wholesaler.

147.    That same month, Generic Competitor A approached an entity that sourced drugs through a variety of channels. This entity asked over 20 wholesalers, several hospitals and pharmacies, and even an animal veterinary clinic if they could supply Daraprim. None was able to do so.

148.    Generic Competitor A also approached several companies that focused specifically on acquiring branded drug samples for FDA testing. Once again, none of them could source any Daraprim in meaningful quantities. A few were able to track down single bottles, but none could

-34-

obtain the six bottles from a single lot that Generic Competitor A needed to satisfy the FDA's requirements. One company told Generic Competitor A that the "US item is impossible to get." Another explained that "the manufacturer is involved in every bottle transaction, which is very unusual."

149.    Despite spending a year trying to buy sufficient Daraprim from the same lot so that it could conduct FDA-required bioequivalence testing, Generic Competitor A was unable to do so. It thus could not bring a generic Daraprim to the market at that time.

150.    Absent Defendants' anticompetitive conduct, Generic Competitor A likely would have launched a generic Daraprim product in 2018 or earlier.

**B.    Generic Competitor B**

151.    Upon information and belief, Generic Competitor B also sought to develop a generic version of Daraprim. As an experienced generic manufacturer, Generic Competitor B was also attracted to Daraprim because it was off patent and faced no generic competition at the time.

152.    Generic Competitor B had to procure a minimum of six bottles of branded Daraprim to perform the FDA-required bioequivalence testing. This too was before Vyera had acquired the rights to Daraprim, meaning Daraprim was still readily available through normal commercial channels. Generic Competitor B had no trouble buying the six 100-count bottles of Daraprim from a local pharmacy, at a price of $250 per bottle. Neither the pharmacy nor Generic Competitor B had to contact the manufacturer about the transaction or seek permission for the sale.

153.    Like Generic Competitor A, Generic Competitor B chose Ipca as its pyrimethamine API supplier. Ipca had a U.S. DMF for pyrimethamine, which appealed to Generic Competitor B because using an API supplier with a manufacturing process approved by the FDA would expedite the approval of its generic Daraprim product.

-35-

154.   As with Generic Competitor A, however, the FDA's January 2015 import ban on Ipca interrupted Generic Competitor B's development. This required Generic Competitor B to look for another pyrimethamine API supplier.

155.   Generic Competitor B entered into a supply agreement with a manufacturer that was supplying pyrimethamine API in Europe. That API supplier agreed to provide Generic Competitor B with pyrimethamine API for both development and commercial use.

156.   When Generic Competitor B submitted its ANDA to the FDA, it provided the results from its bioequivalence testing, in which it had compared product manufactured with API from its new pyrimethamine source and the branded Daraprim tablets it had purchased from the local pharmacy. The ANDA also included information on the new API supplier's pyrimethamine manufacturing process.

157.   In its preliminary response, the FDA required Generic Competitor B to correct several deficiencies, including deficiencies related to API. Although Generic Competitor B immediately contacted its pyrimethamine API supplier to seek assistance in responding to the deficiencies, by this time the supplier was in the process of negotiating its exclusive pyrimethamine supply contract with Vyera. The API supplier told Generic Competitor B that it was "no longer supporting" Generic Competitor B's ANDA.

158.   Generic Competitor B did not give up its development efforts. It continued to try to persuade the API supplier to reverse its decision and help it resolve the deficiencies the FDA had identified. An executive of Generic Competitor B even met with the supplier in person to implore it to sell Generic Competitor B enough API for the initial launch of a generic product. The API supplier refused.

159.    The FDA later sent Generic Competitor B a complete response to its ANDA. The FDA highlighted several deficiencies arising from the API manufacturing process. Generic Competitor B reiterated its request to the API supplier for help in resolving the deficiencies but again the supplier refused.

160.    Still not ready to give up, Generic Competitor B switched API suppliers for a second time. This time it chose a supplier that had never previously manufactured pyrimethamine API, meaning it had to embark on a lengthy testing and approval process with the FDA. The new supplier also had to engage in the protracted process of helping Generic Competitor B resolve the manufacturing deficiencies that had arisen when Generic Competitor B worked with its prior API supplier, further delaying Generic Competitor B's generic launch.

161.    But for Defendants' exclusionary conduct, Generic Competitor B would have launched its generic Daraprim product in 2019 or earlier.

**C.    Generic Competitor C**

162.    Upon information and belief, Defendants' monopolistic conduct also prevented Generic Competitor C from developing generic Daraprim. Were it not for Defendants' conduct, Generic Competitor C likely would be currently selling a generic version of Daraprim.

163.    Generic Competitor C was motivated to develop a generic Daraprim product in early 2016 when it learned of Vyera's massive price increase.

164.    Having identified Fukuzyu as the only pyrimethamine API supplier with an approved U.S. DMF, Generic Competitor C reached out to Fukuzyu in February 2016 to inquire about purchasing pyrimethamine. Generic Competitor C never heard back from Fukuzyu.

165.    A few months later, in June 2016, Generic Competitor C began working with another potential source for pyrimethamine API. This company did not then manufacture

pyrimethamine, and therefore the two companies began working together to create a manufacturing process for which they could submit a DMF to the FDA.

166.    Meanwhile, Generic Competitor C still hoped it might be able to acquire API from Fukuzyu because that would make the ANDA approval process quicker and less costly. Generic Competitor C used an intermediary to contact Fukuzyu in September 2017 to discuss procuring pyrimethamine. Fukuzyu disclosed that it had an exclusive supply agreement with Vyera in the United States, and that it could provide the intermediary with pyrimethamine API only if the intermediary could guarantee that the API would "not be used to make pyrimethamine drug product, for human use, that will find its way back to the US for commercial purposes."

167.    These restrictions would have precluded Generic Competitor C from using Fukuzyu's pyrimethamine API for generic Daraprim in the US. Accordingly, Generic Competitor C abandoned its efforts with Fukuzyu in January 2018, and concentrated on working with its other API development partner. Finally, three years after the partnership began, the would-be new API supplier submitted a DMF for pyrimethamine API to the FDA.

168.    At the same time it struggled to find a source for pyrimethamine API (due to Defendants' monopolistic conduct), Generic Competitor C also wrestled with procuring the branded Daraprim samples it needed to conduct FDA-required bioequivalence testing.

169.    In late 2016, Generic Competitor C tried to purchase Daraprim samples through Pharmaceutical Buyers Inc., a company that focuses on procuring samples of branded drugs. Pharmaceutical Buyers Inc. had a successful record of obtaining branded samples of other drugs for Generic Competitor C. With Daraprim, however, the company was unable to source any samples.

170.   In January 2017, Generic Competitor C tried another specialty supplier, AdiraMedica, LLC, in hopes of locating Daraprim samples. AdiraMedica approached Vyera's distributor ASD Healthcare, which responded that "Daraprim is available to hospitals and government facilities only at this time."

171.   Also in early 2017, Generic Competitor C sought to purchase Daraprim from a local hospital. The hospital replied that it was precluded through an agreement with its supplier from reselling Daraprim to third parties. This was after Vyera had instituted its restrictions on resales.

172.   Acting on behalf of Generic Competitor C, AdiraMedica went directly to Vyera in March 2017. Although Vyera did not outright refuse to supply Daraprim, it noted that the ultimate purchaser would be required to sign an indemnification agreement. Several weeks later, AdiraMedica received a draft purchase agreement from Vyera that, among other things, would have required the ultimate purchaser to indemnify Vyera for all legal claims related in any way to Daraprim, regardless of whether the claim arose out of the buyer's purchase or use of the product. Vyera also demanded that if the ultimate purchaser was a generic company, it must reveal its identity and sign the agreement.

173.   AdiraMedica, on behalf of Generic Competitor C, requested that Vyera delete the unreasonable indemnity provisions. Vyera did not respond to the request.

174.   Generic Competitor C finally succeeded in buying two bottles of Daraprim in January 2018 for the price of $115,250 per bottle from Reliant Specialty LLC. Some months later, however, Generic Competitor C was informed by Reliant Specialty that Vyera had barred it from selling Daraprim. Reliant Specialty also said that Defendant Mulleady, on behalf of Vyera, had bought back its entire remaining Daraprim inventory.

-39-

175.    Not long after, Mulleady approached Generic Competitor C on behalf of Vyera. Mulleady urged Generic Competitor C to stop trying to develop its own generic Daraprim product and to instead work with Vyera on an ANDA for an authorized generic. Subsequently, Mulleady and Mithani provided a spreadsheet to Generic Competitor C that purported to show that Generic Competitor C would be better off partnering with Vyera on an authorized generic than developing its own generic product.

176.    In May 2018, Mulleady met once more with Generic Competitor C. This time, the carrot of an authorized generic was matched with a stick: Mulleady told Generic Competitor C that he was the one who had prevented Reliant Specialty from providing Daraprim to Generic Competitor C. He boasted that Vyera had also blocked two potential generic entrants from the market through Vyera's exclusive supply agreement with RL Fine. He further warned Generic Competitor C that he knew the identity of its API supplier.

177.    Generic Competitor C's discussions with Vyera ended in June 2018, after which Generic Competitor C continued to pursue its own ANDA.

178.    Were it not for Defendants' exclusionary conduct, Generic Competitor C likely would have launched a generic Daraprim product in 2018 or earlier.

**D.    Mylan, N.V.**

179.    Defendants' conduct also caused Mylan, one of the world's largest pharmaceutical companies, to drop its plans to develop a generic Daraprim product.

180.    Mylan began to investigate developing generic Daraprim in late 2015. To assess its commercial viability, Mylan acquired IQVIA sales data on the branded drug. Although Mylan knew that the publicly available Daraprim sales data were underreported, it could not arrive at a more accurate number because Vyera did not disclose its Daraprim sales information.

181.    Moreover, Mylan could not procure the branded Daraprim samples it needed for bioequivalence testing. For almost three years, Mylan attempted to purchase Daraprim samples from seven different sources. Several of them told Mylan that they had no access to a Daraprim supply, but provided different reasons why. One stated that Daraprim was in restricted distribution and that it was "[f]or inpatient hospitals only," while another told Mylan that Daraprim was "only available to inpatient hospital pharmacies."

182.    Mylan eventually gave up trying to develop generic Daraprim, concluding it was too difficult and expensive to acquire branded Daraprim samples. In abandoning the project, Mylan specifically cited its inability to get a "real sense" of Daraprim sales data because the product was "no longer reported in [IQVIA]".

183.    But for Defendants' anticompetitive conduct, Mylan likely would have launched a generic Daraprim product in 2018 or earlier.

## X.    Defendants Foreclose Generic Entry, Forcing Purchasers to Pay Higher Prices

184.    Because of Defendants' anticompetitive and deceptive conduct, the entry of generic Daraprim was substantially delayed. Absent Defendants' scheme, at least one generic version of Daraprim would have entered the market by no later than 2018 (and likely earlier), and there would likely be multiple generic Daraprim options available today, and at lower prices.

185.    Vyera's restrictions on the resale of Daraprim prevented several potential generic competitors from acquiring the samples that they needed to conduct the bioequivalence testing required by the FDA. Absent these restrictions, potential generic competitors would have acquired sufficient quantities of Daraprim tablets through commercial distribution channels.

186.    Vyera's exclusive supply agreements with Fukuzyu and RL Fine, the two most viable suppliers of pyrimethamine API in the U.S., prevented potential generic competitors from

securing a reliable, FDA-approved source of the pyrimethamine API, which they needed to develop and manufacture generic Daraprim. Were it not for these exclusive dealings, potential generic competitors could have obtained API from Fukuzyu or RL Fine rather than incurring the delays and expenses associated with working with other suppliers.

187.    Vyera's data-blocking agreements prevented potential generic entrants from developing the information necessary to determine the commercial viability of launching a generic Daraprim product, which deterred potential competitors from entering the market. But for these data-blocking agreements, Mylan and other potential generic companies would have better understood the extent to which Daraprim revenues had grown following Vyera's 4,000 percent price increase, and would have been more attracted to entering the Daraprim market.

188.    Defendants' generic competitors were further hindered by Defendants' deceptive conduct, which concealed and prolonged Defendants' scheme, and prevented generic companies from navigating the exclusionary burdens Defendants erected.

189.    By impeding generic competition, Defendants denied consumers and other purchasers of Daraprim access to the AB-rated generic versions of Daraprim that would offer the same therapeutic benefit as branded Daraprim, but at a fraction of the price—and permitted Vyera to raise its prices and maintain them at such high levels.

190.    When the first generic version of a branded drug comes to market, it is typically sold at a 20 to 30 percent discount to the branded product. With the entry of additional generic competitors, price competition quickly drives prices down to as low as 85 to 90 percent below the brand price. Defendants' anticompetitive conduct has delayed the introduction of this price competition to the detriment of consumers and other purchasers of Daraprim.

191.     Most consumers and end-payers would have purchased the lower-priced AB-rated generic substitutes for Daraprim rather than the higher-priced branded product, and Vyera also would have reduced its Daraprim price, as well.

192.     Defendants' anticompetitive conduct, however, forced consumers and end-payers to continue paying Vyera's monopoly price for Daraprim by depriving them of access to a lower-cost generic alternative and impeding price competition.

193.     Defendants' anticompetitive conduct has caused, and continues to cause, significant economic harm. Plaintiff and Class members likely would have saved hundreds of millions of dollars if generic Daraprim had been made available earlier.

194.     The economic harm from Defendants' conduct is ongoing. But for Defendants' monopolistic scheme, there likely would be additional generic versions of Daraprim available today, leading to more intense price competition and lower prices.

195.     Defendants' anticompetitive conduct, and the corresponding reduction in the availability of Daraprim, has also resulted in harm to patients from delays in treatment, prolonged hospital stays, and poor medical outcomes.

196.     Because toxoplasmosis is a rare condition, and because hospitals typically treat few or no toxoplasmosis patients each year, hospitals usually will not stock Daraprim unless it is affordable. Traditionally, hospitals were able to keep a Daraprim inventory because it was inexpensive and because patients with acute toxoplasmosis need to begin treatment immediately. But since Defendants' 4,000-plus percent price increase, hospitals are reluctant to keep Daraprim in stock, which can lead to dangerous delays when patients present with acute toxoplasmosis.

197.     The high price of Daraprim also impairs hospitals' ability to discharge patients. Physicians are reluctant to discharge patients until they feel confident that the patient can obtain

Daraprim outside the hospital. Because of the high price and limited availability of Daraprim, however, many rehabilitation facilities will no longer accept patients who need it. Such patients remain in the hospital longer than medically necessary, leading to wasted costs, medical complications, and even increased risk of death.

198. Were it not for Defendants' anticompetitive conduct, hospitals and rehabilitation facilities would have had access to lower-cost generic versions of Daraprim years earlier, and patients would find it easier to obtain Daraprim from hospitals and pharmacies.

199. Without an injunction, Defendants' conduct is likely to recur and cause additional harm to consumers and other purchasers. Defendants have continued to engage in their anticompetitive conduct despite Congressional hearings and federal and state investigations.

200. Further, unless enjoined, Vyera is likely to carry out similar monopolization schemes with other drugs. Vyera's goal in acquiring Daraprim was to raise the price to supra-competitive levels through exclusionary conduct and deception. Upon information and belief, Vyera has been searching for drugs with a profile similar to Daraprim so it can execute a similar monopolistic scheme with those drugs.

201. Absent injunctive relief, Defendant Shkreli is likely to purchase the rights to another drug and execute a similar anticompetitive scheme. This was not Shkreli's first scheme in the pharmaceutical industry. Shkreli previously started another pharmaceutical company, Retrophin, for the purpose of purchasing a different drug, raising the price, and implementing restraints on distribution to impede generic competition. And it is likely not his last: Shkreli is and has been actively looking for other drugs with which to replicate this strategy, either through Vyera or a new company.

202.     Finally, without an injunction, Defendant Mulleady is likely to undertake a similar anticompetitive scheme with another product. He actively directed and executed the Daraprim scheme and has been actively looking for other drugs with which to replicate it.

## XI.   Vyera Has Monopoly Power in the Relevant Market for FDA-Approved Pyrimethamine Products

203.     From 2015 until at least March 2020, Vyera possessed monopoly power in the United States with respect to Daraprim and other pyrimethamine products approved by the FDA for sale in the United States.

204.     There is direct evidence of Vyera's monopoly power. In 2015, Vyera increased the price of Daraprim by over 4,000 percent and was able to profitably maintain that price increase.

205.     There is no relationship between the price at which Vyera sells Daraprim and the costs of production. The price of Daraprim massively exceeds Vyera's costs, making it a highly profitable product for Vyera.

206.     Vyera has maintained its monopoly power over Daraprim for a significant period. Vyera raised the price of Daraprim to monopoly levels in 2015 and has maintained similar prices ever since, reaping significant and supra-competitive profits over that time.

207.     There is also indirect evidence of Vyera's monopoly power. For years, Vyera had a 100 percent share of the relevant market for pyrimethamine products approved for sale in the United States by the FDA. Vyera maintained this 100 percent market share since it purchased the rights to Daraprim in 2015 until generic entry occurred in March 2020.

208.     The relevant product market is FDA-approved pyrimethamine products (or, put another way, branded Daraprim and its AB rated generic equivalents).

209.     Despite Vyera's 4,000 percent price increase for Daraprim, most doctors continue to prescribe Daraprim instead of switching patients to non-pyrimethamine products or non-FDA-approved pyrimethamine products.

210.     Non-pyrimethamine pharmaceutical products are not reasonable substitutes for pyrimethamine products and thus are not included in the relevant market.

211.     Non-FDA-approved    pyrimethamine    products,    such    as    compounded pyrimethamine, also are not reasonable substitutes for FDA-approved pyrimethamine products and thus are not included in the relevant market.

212.     Unlike   non-pyrimethamine   products   and   non-FDA-approved   pyrimethamine products, generic Daraprim would be reasonably interchangeable with Daraprim. AB-rated generic Daraprim would constrain the price of branded Daraprim and thus is in the same relevant product market.

213.     The fact that the four largest pharmacy benefit managers ("PBMS"), which act as third-party administrators for health plans' pharmaceutical benefits, maintained Daraprim on their formularies despite Vyera's massive price increase confirms that there is no reasonable substitute for FDA-approved pyrimethamine products.

214.     As was noted in the Government Complaint, a Vyera executive explained in January 2016 that Vyera has "not had any rejections from commercial payers for Daraprim . . . because payers recognize the potential life-saving value of the medication, it is the only FDA approved therapy for toxo[plasmosis] . . . and the budget impact is low given the relatively low volume of patients."

215.     The "SSNIP" test (also known as the "hypothetical monopolist" test) further confirms that the relevant market consists of FDA-approved pyrimethamine products. The SSNIP

test is a methodology used by antitrust economists to define a relevant market based on empirical information. The objective of a SSNIP test is to identify the narrowest set of products for which a hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price (SSNIP). If enough purchasers would accept a SSNIP rather than switch to another product, such that the price increase would be profitable, the product set that was chosen constitutes a relevant antitrust market.

216.    Here, Defendants increased the price of Daraprim by over 4,000 percent after they acquired its rights in 2015. They profitably maintained that price increase for over five years. That is substantially more than "a small but significant and non-transitory increase in price". In sum, Vyera has had a proven ability to impose a price increase far greater than a SSNIP while retaining enough sales to make the price increase profitable for over five years. This demonstrates under the SSNIP test that FDA-approved pyrimethamine products are the relevant product market for antitrust purposes.

217.    The relevant geographic market is the United States. Pharmaceutical products are sold and regulated on a nationwide basis. Additionally, because the U.S. market is limited to FDA-approved products, it can only include products sold inside the United States.

218.    There are substantial barriers to entry into the market for FDA-approved pyrimethamine products. Potential new entrants need to obtain FDA approval, a process that is expensive and can take several years. Moreover, Vyera has maintained its monopoly power by erecting additional barriers to entry, including: (1) restrictions on resales of branded Daraprim, thereby blocking generic companies from acquiring sufficient Daraprim for FDA-required bioequivalence testing; (2) exclusive supply agreements with the only two potentially viable suppliers of pyrimethamine API, thereby blocking generic companies from procuring the essential

ingredient needed to manufacture generic Daraprim products; and (3) data-blocking agreements to prevent competitors from ascertaining the commercial viability of a competing FDA-approved pyrimethamine product.

## XII.   Antitrust Injury

219.   Defendants' resale restrictions, exclusive agreements, data-blocking agreements, and deception blocked and delayed the generic competition that would have reduced prices for Daraprim purchasers like Plaintiff and members of the proposed Classes.

220.   Plaintiff and the proposed Classes paid substantial sums to purchase Daraprim during the relevant times. Because of Defendants' anticompetitive and deceptive conduct, Plaintiff and the proposed Classes have been compelled to pay artificially inflated prices for Daraprim. Those prices have been substantially higher than the prices Plaintiff and the proposed Classes would have paid but for Defendants' illegal conduct. Plaintiff and the proposed Classes continue to pay artificially high, supra-competitive prices for Daraprim.

221.   Plaintiff and the proposed Classes have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

222.   But for Defendants' anticompetitive conduct, one or more generic competitors would have entered the market for Daraprim by 2018 or earlier.

223.   Defendants' efforts to restrain competition in the relevant market has affected, and continues to substantially affect, interstate and intrastate commerce throughout the United States.

224.   Defendants' anticompetitive efforts delayed and deterred generic competitors, preventing price competition for Daraprim.

225.     Prices for Daraprim have and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Plaintiff and members of the proposed Classes have paid and will continue to pay are traceable to, and the foreseeable result of, Defendants' overcharges.

## XIII.  Class Action Allegations

226.     Plaintiff, on behalf of itself and all other similarly situated indirect purchasers, seeks injunctive relief, legal fees and costs, restitution, and damages, measured as overcharges, trebled where available under applicable law, based on allegations of anticompetitive, deceptive, and unjust conduct in the market for Daraprim and its generic equivalents.

227.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief pursuant to Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), on behalf of the following class of indirect purchasers (the "Nationwide Injunctive Relief Class"):

> All Third-Party Payor entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim from August 7, 2015 through the present (the "Class Period").

228.     Plaintiff also brings this action on behalf of itself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to state antitrust and consumer protection laws, as well as the common law of unjust enrichment on behalf of the following class ("Damages Class"):

> All Third-Party Payor entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim in the Indirect Purchaser States during the Class Period.

229.    The "Indirect Purchaser States" are Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

230.    Excluded from the Classes are Defendants and their employees, affiliates, parents, and subsidiaries, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

231.    The members of the Classes are so numerous and geographically dispersed across the country such that joinder of all members is impracticable. While the exact number of members of the Classes is unknown to Plaintiff at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in the Classes and that their identities can be identified from records in Defendants' possession, custody, or control.

232.    Plaintiff's claims are typical of the claims of the other members of the Classes. There are questions of law and fact common to the Classes that relate to the existence of the anticompetitive and deceptive conduct alleged herein, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

      a.      Whether Defendants possessed monopoly power in the market for Daraprim and its generic equivalents (i.e., FDA-approved pyrimethamine products);

      b.      Whether Defendants willfully obtained and/or maintained monopoly power over Daraprim and its generic equivalents in violation of Section 2 of the

Sherman Act;

c.     Whether Defendants' resale restrictions unreasonably restrained trade in violation of Section 1 of the Sherman Act;

d.     Whether Defendants' exclusive pyrimethamine API supply agreements unreasonably restrained trade in violation of Section 1 of the Sherman Act;

f.     Whether Defendants' anticompetitive conduct violated state antitrust laws;

g.     Whether Defendants' anticompetitive and deceptive conduct violated state consumer protection laws;

h.     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Damages Class;

i.     Whether Defendants' conduct has substantially affected interstate commerce;

j.     Whether Defendants' conduct caused injury to Plaintiff and members of the Classes;

k.     The appropriate injunctive and related equitable relief for the Nationwide Injunctive Relief Class; and

l.     The appropriate class-wide measure of restitution and damages for the Damages Class.

233.   Like all members of the Classes, Plaintiff purchased Daraprim indirectly from Defendants at supra-competitive prices caused by Defendants' anticompetitive conduct. Plaintiff's interests are coincident with and not antagonistic to those of the other members of the Classes. Plaintiff is a member of the Classes, has claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the Classes. In addition, Plaintiff is

represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

234.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications.

## XIV.    Plaintiff's Claims Are Not Barred by Any Statute of Limitations

### A.    Defendants Are Engaged in a Continuing Violation

235.    Plaintiff repeats and re-alleges the allegations set forth above.

236.    This Complaint alleges a continuing course of unlawful conduct that has occurred within each applicable limitations period and continues to this day. Each Defendant has engaged in unlawful conduct and committed overt acts within each applicable limitations period by implementing, overseeing, and enforcing the anticompetitive sale restrictions, supply agreements, and other contracts they have used to thwart generic competition for Daraprim.

237.    Defendants' ongoing unlawful conduct has inflicted continuing and accumulating harm within each applicable limitations period.

238.    Because Defendants have engaged in a continuing course of conduct within each limitations period, Plaintiff's claims are timely.

### B.    Fraudulent Concealment Tolled the Statutes of Limitations

239.    The application of the doctrine of fraudulent concealment also tolled the statute of limitations on Plaintiff's and Class members' claims. Plaintiffs and the members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, Defendants' anticompetitive conduct until January 27, 2020—the date the Federal Trade Commission and State of New York first sued Defendants for the conduct alleged herein—

because Defendants' wrongfully concealed their anticompetitive scheme and carried it out in a manner that precluded detection.

240.    Before that time, Plaintiff and members of the Classes were unaware of Defendants' unlawful conduct because Defendants affirmatively concealed it from the public. Defendants denied that they were working to impede generic competition; misrepresented the existence, scope, and purpose of their sale restrictions; claimed that generic companies had access to Daraprim; and claimed they were working to expand Daraprim's availability, not restrict it. Each of these claims was false and prevented Plaintiff and members of the Classes from discovering the anticompetitive conduct challenged herein.

241.    Due to Defendants' fraudulent concealment, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until January 27, 2020.

C.      **The Statue of Limitations Did Not Begin to Run Until January 2020 Because Plaintiff Did Not and Could Not Discover Its Claims**

242.    Separate and apart from Defendants' fraudulent concealment, the applicable statute of limitations did not begin to run until January 27, 2020 because Plaintiffs and the members of the Classes did not have knowledge of the conduct alleged herein, or of facts sufficient to place them on inquiry notice of their claims.

243.    Until the FTC and State of New York brought suit, Plaintiffs and members of the Classes did not meaningfully interact with the Defendants, and had no means from which they could have discovered the anticompetitive conduct described in this Complaint. No information in the public domain was available to Plaintiffs and members of the Classes concerning the anticompetitive conduct alleged herein.

244.    For this additional reason, the statute of limitations as to Plaintiff's and the Classes' claims did not begin to run until January 27, 2020 at the earliest.

## XV.    Causes of Action

<u>First Cause of Action</u>
**Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**
**Monopoly Maintenance (on behalf of Plaintiff and the Nationwide Class)**

245.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

246.    From 2015 until at least March 2020, Vyera and Phoenixus had monopoly power in the United States with respect to FDA-approved pyrimethamine products.

247.    Defendants willfully maintained this monopoly power through their course of anticompetitive conduct.

248.    There is no valid procompetitive justification for Defendants' exclusionary conduct in the market for FDA-approved pyrimethamine products.

249.    Defendants' anticompetitive acts constitute unlawful monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

<u>Second Cause of Action</u>
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Agreements in Restraint of Trade (on behalf of Plaintiff and the Nationwide Class)**

250.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

251.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

<u>Third Cause of Action</u>
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**Agreements in Restraint of Trade (on behalf of Plaintiff and the Nationwide Class)**

252.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

253.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Fourth Cause of Action**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

254.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

255.    At all relevant times, Defendants possessed monopoly power in the relevant market. Defendants possessed the power to control prices in, and exclude competitors from, the relevant market.

256.    Through their overarching anticompetitive scheme, including their agreements in restraint of trade with respect to the sale of Daraprim and pyrimethamine API, Defendants willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than greater business acumen, and thereby injured competition as well as Plaintiff and the Class.

257.    Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations. Their injury consists of having paid higher prices for Daraprim than they would have paid in the absence of those violations. It was Defendants' conscious objective to further their dominance in the relevant market by and through the overarching anticompetitive scheme.

258.    There is no valid procompetitive business justification for Defendants' anticompetitive conduct, and to the extent Defendants offer one, it is pretextual and not cognizable, and the procompetitive benefits of Defendants' conduct do not outweigh their anticompetitive harms and/or could have been achieved through less restrictive means.

259.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the state antitrust statutes set forth below.

260.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Arizona** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) price competition for generic Daraprim was restrained, suppressed, and eliminated throughout Arizona; (2) prices for Daraprim were raised, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' anticompetitive conduct substantially affected Arizona commerce.

c.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Arizona Revised Statutes, §§ 44-1401, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes, §§ 44-1401, *et*

*seq.*

261.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **California** law:

a.    During the Class Period, Defendants engaged in a continuing unlawful trust and agreements in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Each Defendant has acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of Daraprim at supra-competitive levels.

b.    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and others, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of Daraprim.

c.    For the purpose of forming and effectuating the unlawful trust, Defendants have done those things which they combined and conspired with others to do, including but not limited to the acts, practices and course of conduct set forth above and fixing, raising, stabilizing, and pegging the price of Daraprim.

d.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of Daraprim has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for Daraprim have been fixed, raised, stabilized, and pegged at

artificially high, non-competitive levels in the State of California and throughout the United States; and (3) those who purchased Daraprim have been deprived of the benefit of free and open competition.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property in that they paid more for Daraprim than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of the Cartwright Act, Plaintiff and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

262.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **District of Columbia** law:

a.     Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq*.

263.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Hawaii** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected

Hawaii commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Hawaii Revised Statutes §§ 480-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under the Hawaii Antitrust Act.

264.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Illinois** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Illinois; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff

and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Illinois Compiled Statutes 10/1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Illinois Compiled Statutes 10/1, *et seq*.

265.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Iowa** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint in trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq*.

266.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Kansas** law:

      a.      Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in

restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.
Accordingly, Plaintiff and members of the Damages Class seek all forms of
relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

267.    Plaintiff incorporates and realleges each and every allegation set forth in the
preceding paragraphs of this Complaint and further alleges the following violation of **Maine** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and
agreements in restraint of trade in the market for Daraprim and its generic
equivalents had the following effects: (1) Daraprim price competition was
restrained, suppressed, and eliminated throughout Maine; (2) Daraprim
prices were raised, fixed, maintained and stabilized at artificially high levels
throughout Maine; (3) Plaintiff and members of the Damages Class were
deprived of free and open competition; and (4) Plaintiff and members of the
Damages Class paid supra-competitive, artificially inflated prices for
Daraprim.

b.    During the Class Period, Defendants' illegal conduct substantially affected
Maine commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff
and members of the Damages Class were injured in their business and
property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to
monopolize, conspired to monopolize, and entered into agreements in
restraint of trade in violation of Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et
seq*. Accordingly, Plaintiff and members of the Damages Class seek all

relief available under Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

268.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Michigan** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

269.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Minnesota** law:

a.      Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.      During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

270.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Mississippi** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

271.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Nebraska** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

272.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Nevada** law:

a.     Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*.

273.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New Hampshire** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of New Hampshire Rev. Stat. Ann. §§ 356:1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Hampshire Rev. Stat. Ann. §§ 356:1, *et seq*.

274.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New Mexico** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

275.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New York** law:

    a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New York; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    b.    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

    d.    The conduct set forth above is a *per se* violation of the New York General Business Laws §§ 340, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

276.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **North Carolina** law:

    a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    b.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et seq*.

277.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **North Dakota** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

278.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Oregon** law:

    a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

279.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Puerto Rico** law:

a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Puerto Rico; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Puerto Rico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Puerto Rico commerce.

c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of 10 L.P.R.A. §§ 260, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under 10 L.P.R.A. §§ 260, *et seq*.

280.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Rhode Island** law:

    a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of R.I. Gen. Laws §§ 6-36-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under R.I. Gen. Laws §§ 6-36-1, *et seq*.

281.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **South Dakota** law:

      a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

      b.    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

      c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

      d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of S.D. Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under S.D. Codified Laws Ann. §§ 37-1, *et seq.*

282.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Tennessee** law:

a.      Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

283.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Utah** law:

    a.    Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Utah; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    b.    During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

    d.    By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

284.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Vermont** law:

a.   Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.   During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq*.

285.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **West Virginia** law:

a.      Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

286.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Wisconsin** law:

a.     Defendants' monopolization scheme, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Daraprim prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants monopolized, attempted to monopolize, conspired to monopolize, and entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

287.    Plaintiff and members of the Damages Class in each of the above states were injured in their business and property by Defendants' unlawful monopolization, monopoly maintenance, attempt to monopolize, and agreements in restraint of trade in the market for Daraprim and its generic equivalents. Plaintiff and members of the Damages Class paid more for Daraprim than they otherwise would have paid in the absence of Defendants' unlawful conduct. This is the type of injury the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

288.    In addition, Defendants have profited significantly from the aforementioned anticompetitive conduct. Defendants' profits are derived from their anticompetitive conduct and come at the expense and detriment of Plaintiff and members of the Damages Class.

289.    Accordingly, Plaintiff and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### Fifth Cause of Action
### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiff and the Damages Class)

290.    Plaintiff assert these state law claims on behalf of the Damages Class.

291.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

292.    Defendants engaged in unfair competition and unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below. [2]

---

[2] Concurrently with the filing of this Complaint, Plaintiff will notify Defendants in writing of their alleged violations of West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq*. and Massachusetts G.L. c. 93A, and make a demand for relief. Should Defendants not agree to cure or settle their misconduct within the applicable statutory periods (20 and 30 days,

293.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Arkansas** law:

a.    Defendants have engaged in deceptive and unconscionable acts or practices in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*.

b.    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Daraprim was sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

c.    Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.    The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

e.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4)

---

respectively), Plaintiff plans to assert additional claims under both statutes.

Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

f.      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

g.      As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury.

h.      Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

294.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **California** law:

a.      Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.

b.      During the Class Period, Defendants marketed, sold, or distributed Daraprim in California, and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices alleged herein.

c.      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the

California Business and Professions Code, commonly known as the Unfair Competition Law (the "UCL").

d.   Defendants' conduct as alleged herein violates the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violation of Section 2 of the Sherman Act, as set forth above; and (3) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

e.   Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

f.   Defendants' acts or practices are unfair to consumers of Daraprim in California within the meaning of Section 17200, California Business and Professions Code.

g.   Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

h.   The illegal conduct alleged herein is continuing and there is no indication

that Defendants will not continue such activity into the future.

i.      The unlawful and unfair business practices of Defendants, each of them, have caused and continue to cause Plaintiff and members of the Damages Class to pay supra-competitive and artificially-inflated prices for Daraprim. Plaintiff and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

j.      As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiff and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that were obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

295.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **District of Columbia** law:

a.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq*.

b.      Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in the District of Columbia.

c.      Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.      The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904. Plaintiff and members of the Damages Class were not aware of Defendants' anticompetitive conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Daraprim. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff and members of the Damages Class lacked any meaningful choice in purchasing Daraprim because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff and the Damages Class could avoid the overcharge. Defendants' conduct with regard to sales of Daraprim, including their illegal conduct to set the price of Daraprim at supra-competitive levels, exclude generic competition, and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and the Damages Class. The suppression of competition that has resulted from Defendants' anticompetitive conduct has ultimately resulted in

unconscionably higher prices for consumers and others who paid for Daraprim so that there was a gross disparity between the price paid and the value received for Daraprim.

e.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

f.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

296.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Florida** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

b.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in Florida.

      c.      Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

      d.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Florida; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

      e.      During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

      f.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

297.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Hawaii** law:

      a.      Defendants have engaged in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling

and/or maintaining, at artificial and/or non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in Hawaii.

b.      Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

c.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

d.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under the statute.

298.      Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Idaho** law:

a.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Idaho Consumer Protection Act, Idaho Code §§ 48-601, *et seq*.

b.  Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in Idaho.

c.  Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.  Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Idaho; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Idaho; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

e.  During the Class Period, Defendants' illegal conduct substantially affected Idaho commerce and consumers.

f.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with

further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

299.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Michigan** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq*.

b.    Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Michigan.

c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Michigan. This conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.    Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of

Daraprim they purchased.

e.     Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.     Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under the Michigan Consumer Protection Act.

300.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Minnesota** law:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq*.

b.     Defendants engaged in the conduct described in this Complaint in

connection with the sale of Daraprim in trade or commerce in a market that includes Minnesota.

c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Minnesota. This conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.    Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Daraprim by making public statements that were not in accord with the facts.

f.    Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

g.    Defendants' unlawful conduct had the following effects: (1) Daraprim price

competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

h.     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under the Minnesota Consumer Fraud Act.

301.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Missouri** law:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

b.     Plaintiff and members of the Damages Class purchased Daraprim for personal, family, or household purposes.

c.     Defendants engaged in the conduct described herein in connection with the sale of Daraprim in trade or commerce in a market that includes Missouri.

d.     Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Missouri. This

conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

e.      Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

f.      Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Daraprim by making public statements that were not in accord with the facts.

g.      Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

h.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive,

artificially inflated prices for Daraprim.

i.    As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property.

j.    Accordingly, Plaintiff and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq*., 15 CSR 60-8.010, *et seq*., and 15 CSR 60-9.010, *et seq*., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

302.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Montana** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Consumer Protection Act of 1973, Mont. Code, §§ 30-14-101, *et seq*.

b.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Montana; (2) Daraprim prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout Montana; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

    c.    Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

    d.    During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

    e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

303.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Nebraska** law:

    a.    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, *et seq*.

    b.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout

Nebraska; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

c.      Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

304.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Nevada** law:

a.      Defendants have engaged in deceptive trade practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.

b.      Defendants engaged in the conduct described herein in connection with the sale of Daraprim in trade or commerce in a market that includes Nevada.

c.      Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices

at which Daraprim was sold, distributed or obtained in Nevada. This conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.   Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.   Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Daraprim by making public statements that were not in accord with the facts.

f.   Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

g.   Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4)

Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim. As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Nev. Rev. Stat. § 598.0993.

305.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New Hampshire** law:

   a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

   b.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

   c.    Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce and consumers.

e.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.H. Rev. Stat. Ann. tit. XXXI § 358-A:10 and 358A:10-a.

306.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New Mexico** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*.

b.    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Daraprim was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

c.    The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiff and members of the Damages Class and the

prices paid by them for Daraprim as set forth in N.M.S.A., § 57-12-2E. Plaintiff and members of the Damages Class were not aware of Defendants' anticompetitive conduct and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Daraprim. Defendants had the sole power to set that price and Plaintiff and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiff lacked any meaningful choice in purchasing Daraprim because they were unaware of the unlawful overcharge and there was no alternative source of supply through which Plaintiff could avoid the overcharges. Defendants' conduct with regard to sales of Daraprim, including their illegal anticompetitive conduct to secretly fix the price of Daraprim at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiff and the public. Defendants took grossly unfair advantage of Plaintiff and the Damages Class. The suppression of competition that has resulted from Defendants' anticompetitive conduct has ultimately resulted in unconscionably higher prices for consumers and others who paid for Daraprim so that there was a gross disparity between the price paid and the value received for Daraprim.

d. Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Daraprim prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout New Mexico; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

e. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

f. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiff and members of the Damages Class were injured and are threatened with further injury. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

307. Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **New York** law:

a. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of New York Gen. Bus. Law § 349, *et seq*.

b. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

c. Defendants made public statements about the prices and distribution of Daraprim that Defendants knew would be seen by New York consumers;

such statements either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of the pricing for Daraprim; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information.

d.     Because of Defendants' unlawful trade practices in New York, Plaintiff and members of the Damages Class who indirectly purchased Daraprim were misled to believe that they were paying a fair price for Daraprim or the price increases for Daraprim were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' unlawful trade practices.

e.     Defendants knew that their unlawful trade practices with respect to pricing Daraprim would have an impact on New York consumers and not just Defendants' direct customers.

f.     Defendants knew that their unlawful trade practices with respect to pricing Daraprim would have a broad impact, causing consumer class members who indirectly purchased Daraprim to be injured by paying more for Daraprim than they would have paid in the absence of Defendants' unlawful trade acts and practices.

g.     The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an

honest marketplace in which economic activity is conducted in a competitive manner.

h.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout New York; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

i.    During the Class Period, Defendants marketed, sold, or distributed Daraprim in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

j.    During the Class Period, each Defendant, directly, or indirectly and through affiliates manufactured, sold and/or distributed Daraprim in New York.

k.    Plaintiff and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

308.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **North Carolina** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

b.    Defendants and their co-conspirators agreed to, and did in fact, act in

restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiff and members of the Damages Class.

c.      Defendants' anticompetitive conduct could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' anticompetitive conduct. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiff and members of the Damages Class could not possibly have been aware. Defendants' public statements concerning the price of Daraprim created the illusion of competitive pricing controlled by market forces rather than supra-competitive pricing driven by Defendants' illegal conduct.

d.      The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

e.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Daraprim prices were raised, fixed, maintained, and stabilized

at artificially high levels throughout North Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

f.      During the Class Period, Defendants marketed, sold, or distributed Daraprim in North Carolina, and Defendants' illegal conduct substantially affected North Carolina commerce and consumers.

g.      During the Class Period, each Defendant, directly, or indirectly and through affiliates manufactured, sold and/or distributed Daraprim in North Carolina.

h.      Plaintiff and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury and seek all relief available under that statute.

309.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **North Dakota** law:

a.      Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unfair Trade Practices Law, N.D. Cent. Code § 51-10, *et seq*.

b.      Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes North Dakota.

c.      Defendants and their co-conspirators agreed to, and did in fact affect, fix,

control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in North Dakota. This conduct constituted a fraudulent or deceptive act or practice and caused substantial injury to Plaintiff and members of the Damages Class.

d.    Defendants concealed, suppressed, omitted, and failed to disclose materials facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. They concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.    Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.    As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of

money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under N.D. Cent. Code § 51-10-06.

310.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Oregon** law:

    a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq*.

    b.    Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Oregon.

    c.    Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Oregon. This conduct constituted unlawful trade practices by employing unconscionable tactics in connection with the sale of Daraprim, and caused substantial injury to Plaintiff and members of the Damages Class.

    d.    Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

    e.    Defendants' statements and conduct concerning the price of Daraprim were

deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.    Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.    As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Or. Rev. Stat. § 646.638.

311.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Pennsylvania** law:

a.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. §§ 201-1, *et seq*.

b.    Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Pennsylvania.

c.      Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Pennsylvania. This conduct constituted unlawful trade practices by employing unconscionable tactics in connection with the sale of Daraprim, and caused substantial injury to Plaintiff and members of the Damages Class.

d.      Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost, distribution, and profits related to the Daraprim they purchased.

e.      Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Pa. Stat. Ann. §§ 201-1, *et seq*.

312.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Rhode Island** law:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

b.     Plaintiff and members of the Damages Class purchased Daraprim for personal, family, or household purposes.

c.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Rhode Island.

d.     Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. Defendants owed a duty to disclose such facts and breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' prices for Daraprim were competitive and fair.

e.     Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

f.     As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

g.     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Daraprim, misled Plaintiff and members of the Damages Class who acted reasonably under the circumstances to believe that they were purchasing Daraprim at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

h.     Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

313.     Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **South Carolina** law:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

b.     Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

c.     Defendants further misled, confused, deceived, and/or defrauded Plaintiff and members of the Damages Class by concealing and misrepresenting their actual sales practices, profits, distribution restrictions, and anticompetitive conduct related to Daraprim.

d.     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class were injured in their business and property and are threatened with further injury. Accordingly, Plaintiff and the members of the Damages Class seek all relief available under that

statute.

314. Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **South Dakota** law:

    a. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws § 37-24, *et seq*.

    b. Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes South Dakota.

    c. Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in South Dakota. This conduct constituted a deceptive act or practice, and caused substantial injury to Plaintiff and members of the Damages Class.

    d. Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

    e. Defendants' statements and conduct concerning the price of Daraprim were

deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.   Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.   As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under S.D. Codified Laws § 37-24-31.

315.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Utah** law:

a.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq*.

b.   Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Utah.

c.   Defendants and their co-conspirators agreed to, and did in fact affect, fix,

control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Utah. This conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.      Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.      Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.      Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Utah; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Utah Code Ann. § 13-11-19(5) and 13-11-20.

316.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Vermont** law:

a.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9 § 2451, *et seq*.

b.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Vermont.

c.     Defendants deliberately failed to disclose material facts to Plaintiff and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Daraprim. Defendants owed a duty to disclose such facts and Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that their prices for Daraprim were competitive and fair.

d.     Defendants' unlawful conduct had the following effects: (1) Daraprim price

competition was restrained, suppressed, and eliminated throughout Vermont; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

e.      As a direct and proximate result of Defendants' violations of law, Plaintiff and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

f.      Defendants' deception, including their omissions concerning the price of Daraprim, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Daraprim at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq*. Accordingly, Plaintiff and members of the Damages Class seek all relief available under that statute.

317.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Virginia** law:

a.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196, *et seq.*

b.   Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Virginia.

c.   Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Virginia. This conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.   Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.   Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.   Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Virginia; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.   As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Va. Code Ann. § 59.1-204(A), *et seq*.

318.   Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges the following violation of **Wisconsin** law:

a.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*.

b.   Defendants engaged in the conduct described in this Complaint in connection with the sale of Daraprim in trade or commerce in a market that includes Wisconsin.

c.   Defendants and their co-conspirators agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Daraprim was sold, distributed, or obtained in Wisconsin. This

conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiff and members of the Damages Class.

d.     Defendants concealed, suppressed, omitted, and failed to disclose material facts to Plaintiff and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Daraprim. The concealed, suppressed, and omitted facts would have been important to Plaintiff and members of the Damages Class as they related to the cost of Daraprim they purchased.

e.     Defendants' statements and conduct concerning the price of Daraprim were deceptive as they had the tendency or capacity to mislead Plaintiff and members of the Damages Class to believe that they were purchasing Daraprim at prices established by a free and fair market.

f.     Defendants' unlawful conduct had the following effects: (1) Daraprim price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Daraprim prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supra-competitive, artificially inflated prices for Daraprim.

g.     As a direct and proximate result of the above-described unlawful practices, Plaintiff and members of the Damages Class suffered ascertainable loss of

money or property. Accordingly, Plaintiff and members of the Damages Class seek all relief available under Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18,, *et seq*.

### Sixth Cause of Action
### Unjust Enrichment
### (on behalf of Plaintiff and the Damages Class)

319.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

320.    As a result of the unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Daraprim.

321.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for Daraprim.

322.    Plaintiff and members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and the members of the Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiff and the members of the Damages Class may make claims on a pro rata basis.

323.    Pursuit of any remedies against the firms from which Plaintiff and the members of the Damages Class purchased Daraprim subject to Defendants' anticompetitive conduct would have been futile.

## XVI.    Prayer for Relief

Accordingly, Plaintiff respectfully requests that:

a.    The Court determine that this action may be maintained as a class action

under Rules 23(a), (b)(2) and (b)(3) and direct that reasonable notice of this action be given to each and every member of the Classes as provided by Rule 23(c)(2).

b.     That Defendants' unlawful monopoly maintenance and agreements in restraint of trade alleged herein be adjudged and decreed violations of Sections 1 and 2 of the Sherman Act, state antitrust and consumer protection laws, and acts of unjust enrichment;

c.     Plaintiff and members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiff and members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

d.     Defendants be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the monopoly, contract, conspiracy, or combination alleged herein, or from entering into any other monopoly, contract, conspiracy, or combination having a similar purpose or effect;

e.     Plaintiff and the members of the Damages Class be awarded restitution for Defendants' ill-gotten gains resulting from their unlawful and inequitable unjust enrichment;

f.     Plaintiff and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

g.     Plaintiff and members of the Classes be granted such other and further relief as the case may require and the Court deems just and proper.

## XVII.   Jury Demand

Plaintiff demands a jury trial on all claims so triable.

DATED: March 4, 2021.                    Respectfully submitted,

_/s/ Kellie Lerner_
Kellie Lerner (KL 0927)
Benjamin Steinberg (*pro hac vice* forthcoming)
Adam Mendel
Vidya Dindiyal (*pro hac vice* forthcoming)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
bsteinberg@robinskaplan.com
amendel@robinskaplan.com
vdindiyal@robinskaplan.com

*Attorneys for Plaintiff BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota, and the Proposed Classes*