**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BCBSM, INC., d/b/a BLUE CROSS and BLUE SHIELD OF MINNESOTA, on behalf of itself and those similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, MARTIN SHKRELI, and KEVIN MULLEADY,<br><br>    Defendants. | Case No. 1:21-cv-1884-DLC |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT;
CERTIFICATION OF SETTLEMENT CLASS; APPROVAL OF NOTICE PLAN;
APPROVAL OF PLAN OF ALLOCATION; AND ENTRY OF
<u>SETTLEMENT APPROVAL SCHEDULE AND RELATED PROCEDURES</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND .............................................................................................. 3

ARGUMENT ...................................................................................................... 7

    I.      The Court Should Preliminarily Approve the Settlement. ..................................... 7

          A.     The Settlement Is Procedurally Fair. ........................................... 8

          B.     The Settlement Achieves an Excellent Result for the Settlement Class. ........................................................................... 8

    II.     The Settlement Class Should be Certified Pursuant to Rule 23 .......................... 11

          A.     The Settlement Class Satisfies the Prerequisites of Rule 23(a). .............. 12

                1.     Numerosity. ........................................................... 12

                2.     Commonality. ......................................................... 13

                3.     Typicality. ............................................................... 13

                4.     Adequacy of Representation. ........................................ 14

          B.     The Settlement Class Also Satisfies the Requirements of Rule 23(b)(3). ........................................................................... 15

                1.     Common Questions of Law and Fact Predominate. ..................... 15

                2.     A Class Action is the Superior Method of Adjudication. ............. 17

                3.     Interim Lead Counsel Should be Appointed as Settlement Class Counsel. ..................................................... 18

    III.    The Court Should Approve the Proposed Form and Manner of Notice. ............. 18

    IV.    The Court Should Enter the Proposed Settlement Approval Schedule ............... 21

    V.    The Court Should Approve the Plan of Allocation ............................................. 22

    VI.    A.B. Data Should be Appointed as the Notice Provider and Claims Administrator ............................................................................. 23

    VII.   Huntington National Bank Should Be Appointed as the Escrow Agent ............. 24

CONCLUSION ................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
    No. 5:09-CV-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ................................................ 7

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................................................ 18

*Bolanos v. Norwegian Cruise Lines Ltd.*,
    212 F.R.D. 144 (S.D.N.Y. 2002) ......................................................................................... 14

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ................................................................................................... 8

*Cohen v. J.P. Morgan Chase & Co.*,
    262 F.R.D. 153 (E.D.N.Y. 2009) ......................................................................................... 11

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ............................................................................................. 14, 17

*Dziennik v. Sealift, Inc.*,
    No. 05-CV-4659 (DLI), 2007 WL 1580080 (E.D.N.Y. May 29, 2007) ............................. 14

*Elkind v. Revlon Consumer Prods. Corp.*,
    No. CV 14-2484 (JS)(AKT), 2017 WL 9480894 (E.D.N.Y. Mar. 9, 2017) ......................... 7

*FTC, et al. v. Vyera Pharmaceuticals*,
    et al., No. 1:20-cv-0706-DLC (SDNY) ................................................................................. 1

*Hernandez v. Anjost Corp.*,
    No. 11 CIV. 1531(AT), 2013 WL 4145952 (S.D.N.Y. Aug. 14, 2013) ............................... 8

*In re Adelphia Commc'ns Corp. Sec. & Derivatives Litig.*,
    271 F. App'x 41 (2d Cir. 2008) ........................................................................................... 19

*In re Aggrenox Antitrust Litig.*,
    No. 3:14-MD-02516 (SRU), 2018 WL 1183734 (D. Conn. Mar. 6, 2018) ......................... 11

*In re Baldwin-United Corp.*,
    105 F.R.D. 475 (S.D.N.Y. 1984) ......................................................................................... 11

*In re Buspirone Pat. Litig.*,
    210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................................... 16

*In re Currency Conversion Fee Antitrust Litig.*,
    264 F.R.D. 100 (S.D.N.Y. 2010) ......................................................................................... 11

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
No. 05 CIV. 2237 (CS), 2013 WL 12461392 (S.D.N.Y. Mar. 12, 2013) *aff'd*, No. 05
CIV. 2237 (CS), 2013 WL 10114257 (S.D.N.Y. Dec. 18, 2013) ....................................... 12

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
343 F. Supp. 3d 394 (S.D.N.Y. 2018), *aff'd sub nom. In re Facebook, Inc.*, 822 F.
App'x 40 (2d Cir. 2020) ................................................................................................. 22

*In re Flonase Antitrust Litig.*,
284 F.R.D. 207 (E.D. Pa. 2012) ...................................................................................... 12, 17

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ..................................................................................... 10

*In re Global Crossing Sec. and ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................................... 11, 13

*In re Initial Pub. Offering Secs. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009) ..................................................................... 8, 12, 13, 18

*In re Initial Public Offering Sec. Litig.*,
243 F.R.D. 79 (S.D.N.Y. 2007) ....................................................................................... 7

*In re Lidoderm Antitrust Litig.*,
No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ....................... 11, 17

*In re Loestrin 24 FE Antitrust Litig.*,
410 F. Supp. 3d 352 (D.R.I. 2019) .................................................................................. 11, 17

*In re Metlife Demutualization Litig.*,
689 F. Supp. 2d 297 (E.D.N.Y. 2010) ............................................................................ 22

*In re NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y.1996) ...................................................................................... 13

*In re NASDAQ Market-Makers Antitrust Litig.*,
176 F.R.D. 99 (S.D.N.Y. 1997) ....................................................................................... 7, 8

*In re Neurontin Antitrust Litig.*,
No. 02-1390, 2011 WL 286118 (D.N.J. Jan. 25, 2011) .................................................. 12, 17

*In re Nexium (Esomeprazole) Antitrust Litig.*,
297 F.R.D. 168 (D. Mass. 2013), *aff'd sub nom, In re Nexium Antitrust Litig.*, 777
F.3d 9 (1st Cir. 2015) ...................................................................................................... 12, 17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019) .................. 23

*In re Platinum & Palladium Commodities Litig.*,
No. 10CV3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014) ......................................... 7

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
338 F.R.D. 294 (D. Mass. 2021) ................................................................................. 11, 17

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
335 F.R.D. 1 (E.D.N.Y. 2020) ..................................................................................... 11, 17

*In re Salomon Analyst Metromedia Litigation*,
544 F.3d 474 (2d Cir. 2008), *abrogated on other grounds by Amgen Inc. v.
Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013) .......................................... 16

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. CV 14-MD-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017)............................ 11, 17

*Larsen v. JBC Legal Group, P.C.*,
235 F.R.D. 191 (E.D.N.Y. 2006) ...................................................................................... 15

*Menkes v. Stolt-Nielsen S.A.*,
270 F.R.D. 80 (D. Conn. 2010) .......................................................................................... 8

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
237 F.R.D. 26 (E.D.N.Y. 2006)........................................................................................... 9

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993) ........................................................................................ 12, 14

*Shelter Realty Corp. v. Allied Maint. Corp.*,
75 F.R.D. 34 (S.D.N.Y. 1977)............................................................................................ 16

*Sims v. Bank of Am. Corp.*,
No. 06-CV-5991 (CPS)(JMA), 2008 WL 479988 (E.D.N.Y. Feb. 19, 2008)...................... 12

*Sykes v. Mel S. Harris & Assocs. LLC*,
780 F.3d 70 (2d Cir. 2015) ................................................................................................ 16

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ............................................................................... 7, 8, 19, 21

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982) ................................................................................................ 11

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) .................................................................................................... 19

Fed. R. Civ. P. 23(e) .............................................................................................................. 7

Fed. R. Civ. P 23(f) ............................................................................................................... 9

Fed. R. Civ. P. 23(g)(1)(A)(i-iv)............................................................................................ 18

Fed. R. Civ. P. 23(g)(1)(B) ................................................................................................... 18

**Other Authorities**

6 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 18:25 & n.4
(4th ed. 2002) ................................................................................................................. 16

Government Action, Shkreli Order, ECF No. 865 (Jan. 14, 2022) ........................................... 10

## INTRODUCTION

Plaintiff BCBSM, Inc. ("Plaintiff") respectfully submits this Memorandum of Law in support of its unopposed Motion for Preliminary Approval of Class Action Settlement; Certification of Settlement Class; Approval of Notice Plan; Approval of Plan of Allocation; and Entry of Settlement Approval Schedule and Related Procedures ("Motion").

Plaintiff has reached a settlement (the "Settlement") to fully resolve this litigation with Defendants Vyera Pharmaceuticals, LLC, Phoenixus AG (together, "the Corporate Defendants"), Martin Shkreli ("Shkreli"), and Kevin Mulleady ("Mulleady," and collectively with the Corporate Defendants and Shrekli, the "Defendants"). The Settlement provides for the payment of up to $28 million into a fund for the Settlement Class's benefit (the "Class Settlement Fund"), including an initial payment of $7 million and up to $21 million in potential contingent payments, as well as substantial injunctive relief, in exchange for the dismissal of this litigation and certain releases. The Settlement was the result of joint settlement negotiations with the parties in the related action *FTC, et al. v. Vyera Pharmaceuticals*, *et al.*, No. 1:20-cv-0706-DLC (SDNY) ("the Government Action," and together with this action, the "Related Daraprim Actions"), and was negotiated in conjunction with the Stipulated Order for Permanent Injunction and Equitable Monetary Relief entered in the Government Action on December 7, 2021 (the "Stipulated Order"). The full terms of the Settlement are set forth in the Settlement Agreement dated January 28, 2022 ("Settlement Agreement"), which is attached as Exhibit A to the accompanying Declaration of Benjamin Steinberg ("Steinberg Decl.").

The Court should preliminarily approve the Settlement. After intensive litigation and extensive arms-length negotiations overseen by Magistrate Judge Robert W. Lehrburger, Plaintiff reached an excellent settlement for the Settlement Class. The Settlement enjoins Defendants'

anticompetitive conduct and secures seventy percent of the up to $40 million that the Corporate Defendants have agreed to pay to settle the Related Daraprim Actions. Plaintiff's investigation into the law and facts of this case demonstrates the Settlement's favorability. The Settlement ensures that the Settlement Class will receive substantial monetary and injunctive relief while avoiding the costs and risks of ongoing litigation, particularly against Defendants with limited resources and competing liabilities. For these reasons, which are set forth more fully below, the Settlement is fair, reasonable, and adequate and meets the test for preliminary approval.

To effectuate the Settlement, Plaintiff has retained A.B. Data, Ltd. ("A.B. Data"), an industry-leading class-action administration firm, to assist in preparing proposed forms and methods for providing notice to the Settlement Class (the "Notice Plan"), as well as a plan for allocating funds to Settlement Class Members (the "Plan of Allocation"). Both Plans, as described herein, are fair, reasonable, and consistent with the procedures commonly used in other third-party payer class actions. Plaintiff has also proposed a schedule for executing the Notice Plan and for completing the remaining settlement approval process (the "Settlement Approval Schedule"). If entered, the Settlement Approval Schedule will help facilitate an efficient and judicious resolution of the settlement process.

Plaintiff therefore requests that the Court enter an Order, substantially in the form of the proposed order attached hereto, (1) preliminarily approving the Settlement; (2) certifying the Settlement Class for purposes of the Settlement; (3) appointing Robins Kaplan LLP as Settlement Class Counsel; (4) appointing Plaintiff as Settlement Class Representative (5) approving the Notice Plan; (6) entering the proposed Settlement Approval Schedule; (7) approving the Plan of Allocation; (8) appointing A.B. Data as the Notice Provider and Claims Administrator; and (9) appointing Huntington National Bank as the Escrow Agent. This Motion is unopposed.

# BACKGROUND

This is a class action, brought on behalf of indirect purchasers of Daraprim, alleging that Defendants illegally thwarted generic competition for Daraprim in violation of federal antitrust laws, and the antitrust, consumer-protection, and unjust enrichment laws of 36 states and territories (the "Indirect Purchaser States").[1] Daraprim is an essential, life-saving drug used in the treatment of toxoplasmosis, a parasitic infection that can be fatal for people with compromised immune systems like those with HIV/AIDS. In 2015, Defendants acquired the U.S. rights to Daraprim and raised the price from $17.50 to $750 per tablet—an increase of approximately 4,185 percent. To block generic competition, Defendants engaged in an array of anticompetitive conduct that prevented competitors from launching a lower-cost, generic version. This included (1) resale restrictions that prevented competitors from obtaining the Daraprim samples they needed for FDA-required testing; (2) exclusive supply agreements that prevented competitors from obtaining the ingredients they needed to manufacture generic Daraprim; and (3) "data-blocking" agreements that denied competitors access to critical Daraprim sales data. Plaintiff alleges this conduct delayed the launch of less expensive generic versions of Daraprim, thereby forcing third-party payers to pay artificially inflated prices for Daraprim, resulting in damages.

Plaintiff filed this lawsuit on March 4, 2021. *See* ECF No. 1. On May 6, 2021, the Court appointed Robins Kaplan LLP as Interim Lead Counsel (hereinafter "Interim Lead Counsel") for a putative class of indirect purchasers of Daraprim. ECF No. 33. On May 21, 2021, Plaintiff filed an Amended Class Action Complaint (the "Complaint") on behalf of itself and (1) a "Nationwide

---

[1] Plaintiff brings claims under laws of the following 36 Indirect Purchaser States: Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

Injunctive Relief Class" consisting of "all entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim from August 7, 2015 through the present; and (2) an otherwise identical "Damages Class" limited to entities that purchased, paid, and or provided reimbursement for Daraprim in one of the 36 Indirect Purchaser States. *See* ECF No. 38.

Given the overlap between this case and the related Government Action, Plaintiff and Defendants agreed to a "Discovery Cooperation Order" under which Plaintiff received all the discovery from the Government Action and agreed not to seek fact discovery that was cumulative or duplicative of that discovery. *See* ECF No. 55. Because discovery in the Government Action did not address class issues, Plaintiff quickly undertook substantial additional discovery related to class certification and damages. In addition to exchanging further discovery with Defendants, Plaintiff subpoenaed documents and data from more than a dozen pharmacies and distributors that sold Daraprim, some of which prompted motion practice. *See, e.g.,* ECF Nos. 82-89, 94-98. Plaintiff also retained Dr. Richard Frank, Director of the Schaeffer Initiative for Health Policy at the Brookings Institution and Professor Emeritus at Harvard University, to serve as Plaintiff's economic expert and help prepare Plaintiff's damages model. In total, Plaintiff obtained more than a million pages of documents from Defendants and third parties, all within an accelerated, four-month discovery period.

In May 2021, Plaintiff and Defendants agreed to mediate before Magistrate Judge Robert W. Lehrburger. *See* ECF No. 50 (referring the case to Judge Lehrburger for settlement purposes). The plaintiffs in the Government Action requested to join the mediation, and the parties agreed to a global mediation before Judge Lehrburger in August 2021 covering both of the Related Daraprim

Actions. The parties submitted detailed mediation briefs to Judge Lehrburger in advance of the mediation outlining their respective positions and preliminary damages estimates. Although the initial mediation session was not successful, global settlement negotiations continued for the next several months, during which the parties made significant progress under Judge Lehrburger's guidance. Plaintiff and Defendants ultimately reached a settlement in principle in December 2021, *see* ECF No. 131, which was negotiated in conjunction with the Stipulated Order entered in the Government Action.

Plaintiff and Defendants executed the Settlement Agreement on January 28, 2022. Plaintiff has entered into the Settlement on behalf of the following Settlement Class,[2] which mirrors the class definition proposed in the Complaint:

> All entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim between August 7, 2015 and January 28, 2022.

Under the Settlement, the Corporate Defendants will pay up to $40 million to settle the Related Daraprim Actions, seventy percent of which (up to $28 million) will be paid to the Class Settlement Fund. *See* Steinberg Decl., Ex. A at § E. This includes an up-front payment of $7 million, as well as up to $21 million in potential contingent payments over time based on certain future revenues earned by the Corporate Defendants.[3] *Id.* This payment structure was based on the

---

[2] Excluded from the Settlement Class are: (a) natural person consumers; (b) Defendants and their employees, affiliates, parents, and subsidiaries, whether or not named in the Complaint; (c) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); and (e) judges assigned to this case and any members of their immediate families.

[3] Specifically, the Corporate Defendants will pay into the Class Settlement Fund 14% of the net proceeds they earn from monetizing a corporate asset other than a Priority Review Voucher, and 14% of the net proceeds they earn from monetizing a Ketamine asset, based on any transactions executed over the next five years, up to a total of $10.5 million. *Id.* at ¶ 61(a). The Corporate

Corporate Defendants' present cash constraints and was negotiated with Judge Lehrburger's guidance after extensive discovery into the Corporate Defendants' current and projected finances. Additionally, under the Settlement, the Corporate Defendants will be enjoined from engaging in the allegedly anticompetitive resale restrictions, exclusive supply agreements, and data-blocking agreements that gave rise to this action, among other injunctive relief. *See id.* at § F.

As for the individual Defendants, the Settlement generally bans Kevin Mulleady from the pharmaceutical industry for seven years under the same terms as set forth in the Stipulated Order. *See id.* at § G. The Settlement also binds Martin Shkreli to the injunctive relief that will be entered against him in the final judgment in the Government Action. *See id.* at § H. As set forth in the Court's January 14, 2022 Opinion and Order against Shkreli in the Government Action (the "Shkreli Order"), Shkreli will be banned for life from participating in the pharmaceutical industry in any capacity. In exchange for this relief, the Settlement Class will release certain claims against Defendants and dismiss this case with prejudice upon the Settlement's final approval. *Id.* at § D.

Plaintiff and Interim Lead Counsel have carefully assessed the strengths and weaknesses of the action and its settlement value, as well as Defendants' financial resources and liabilities, and submit that the Settlement is an excellent result for the Settlement Class. The Settlement ensures that the Settlement Class will receive substantial cash compensation and injunctive relief, while avoiding the risks and costs of continuing to litigate against Defendants who may be unable to satisfy a more substantial judgment. The Settlement merits preliminary approval.

---

Defendants will also pay into the Class Settlement Fund 14% of the net proceeds they earn from any transaction monetizing a Priority Review Voucher executed over the next 10 years, with total contingent payments to the Class Settlement Fund capped at $21 million. *Id.* at ¶ 61(b). A Priority Review Voucher is a lucrative voucher issued by the Food and Drug Administration that entitles a drug product to expedited regulatory review.

**ARGUMENT**

**I.     The Court Should Preliminarily Approve the Settlement.**

Federal Rule of Civil Procedure 23(e) sets forth a two-step process for settling class action litigation. First, the court considers whether to approve a settlement preliminarily for purposes of communicating the settlement terms to proposed class members. *See In re Initial Public Offering Sec. Litig.*, 243 F.R.D. 79, 87 (S.D.N.Y. 2007) ("*In re IPO II*"). Once preliminary approval occurs, class members receive notice of the settlement and a hearing date, at which time they may be heard with respect to final court approval. *In re NASDAQ Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) ("*NASDAQ II*"). At this preliminary stage, a court "need only determine that there is probable cause to submit the agreement to the proposed class members and to hold a fairness hearing, at which time the court will have the opportunity to closely examine the intricacies of the settlement terms and to assess their fairness." *Elkind v. Revlon Consumer Prods. Corp.*, No. CV 14-2484 (JS) (AKT), 2017 WL 9480894, at *16 (E.D.N.Y. Mar. 9, 2017).

In determining whether to grant preliminary approval, a "court starts with the proposition that 'there is an overriding public interest in settling and quieting litigation, and this is particularly true in class actions.'" *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011); *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005). Settlements usually "advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation." *Dairy Farmers*, 2011 WL 1706778, at *2. Courts then consider the "negotiating process leading up to the settlement, *i.e.*, procedural fairness, as well as the settlement's substantive terms, *i.e.*, substantive fairness.'" *In re Platinum & Palladium Commodities Litig.*, No. 10CV3617, 2014 WL 3500655, at *11 (S.D.N.Y.

July 15, 2014). Preliminary approval is appropriate where the settlement "'is the result of serious, informed, and non-collusive negotiations, where there are no grounds to doubt its fairness and no other obvious deficiencies . . . , and where the settlement appears to fall within the range of possible approval.'" *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010).

As demonstrated below, the proposed Settlement merits preliminary approval because it is both procedurally fair and achieves an excellent substantive result for the Settlement Class.

### A.    The Settlement Is Procedurally Fair.

The Settlement is the result of lengthy, arm's-length negotiations between experienced counsel and is thus entitled to a presumption of fairness. *See Wal-Mart Stores, Inc.* 396 F.3d at 116-17. Moreover, Judge Lehrburger's involvement in the settlement discussions supports that the Settlement is procedurally fair and not collusive. *Hernandez v. Anjost Corp.*, No. 11 CIV. 1531(AT), 2013 WL 4145952, at *2 (S.D.N.Y. Aug. 14, 2013). In short, the Settlement was achieved after extensive discovery and months of hard-fought negotiations overseen by the Court. These circumstances support that the Settlement is procedurally fair and reasonable. *See In re Initial Pub. Offering Secs. Litig.,* 260 F.R.D. 81, 87 (S.D.N.Y. 2009) *("In re IPO III")*; *Hernandez*, 2013 WL 4145952, at *2.

### B.    The Settlement Achieves an Excellent Result for the Settlement Class.

To preliminarily approve the Settlement, the Court must only find that the Settlement "falls within the range" of settlements that could possibly merit final approval as "fair, adequate and reasonable". *In re NASDAQ II*, 176 F.R.D. at 102. Whether the Settlement ultimately merits final approval will be determined during the final fairness stage, using the actors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).[4] At this stage, preliminary approval is

_____

[4] The nine *Grinnell* factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

appropriate if the Settlement falls "merely within the range of possible approval." *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006).

The Settlement easily meets the standard for preliminary approval. The Settlement serves the best interests of the Settlement Class by securing a cash recovery of up to $28 million while avoiding the risks of ongoing litigation against Defendants who may be unable to satisfy a large, and potentially competing, judgment. While Plaintiff is confident that it could establish liability against Defendants, especially following the Shkreli Order, the costs and delay of litigation, combined with the uncertainty of whether Plaintiff could collect on a judgment against Defendants, counsel in favor of securing the compensation that the Settlement affords. That compensation, up to $28 million in total, including $7 million now and contingent payments of up to $21 million over time, approaches the lower range of Plaintiff's preliminary damages estimates, meaning Settlement Class Members could potentially recover most of their estimated damages via the Settlement.

The alternatives to the Settlement underscore its favorability. Absent the Settlement, to establish classwide liability, Plaintiff would need to litigate a contested class certification motion and potential Fed. R. Civ. P 23(f) petitions, a lengthy and expensive process that would increase class litigation costs and likely reduce any net class recovery. Plaintiff would also need to litigate summary judgment, another resource-intensive process involving additional expert costs and complex issues concerning the collateral effect of the Shkreli Order on each Defendant. Finally, Plaintiff would need to prove damages on a classwide basis at trial, which would entail a "battle

_____

discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

of the experts" regarding the extent of classwide overcharges. While Plaintiff is confident in its damages calculations, it is possible that the fact finder could award less than $28 million given Defendants' expert's purportedly lower damages figures.[5]

Furthermore, even if Plaintiff secured a favorable judgment that was affirmed on appeal, there is still a risk that Defendants would be unable to pay the judgment and that class members would receive less compensation than they would under the Settlement. This risk is based on expert testimony and other financial documents produced by the Corporate Defendants concerning their potential inability to pay a judgment. S*ee, e.g.,* Government Action, Opinion and Order, ECF No. 591. Plaintiff scrutinized this financial information in detail with the plaintiffs in the Government Action, which influenced Plaintiff's decision to enter into the Settlement. Moreover, even if Defendants had sufficient resources to a pay a substantial judgment now, there is a considerable risk that their liabilities in the Government Action and their ongoing legal fees in this case would exhaust those resources before Plaintiff could collect any judgment.[6]

The Settlement is therefore fair, adequate, and reasonable. It ensures that the Settlement Class will receive substantial monetary and injunctive relief while avoiding the costs and risks of continuing to litigate against Defendants whose resource constraints and other liabilities may restrict their ability to satisfy a judgment. The Settlement is well within the range of settlements that could merit final approval and thus should be preliminarily approved.

---

[5] In any case, the Settlement should "not be judged in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case," which here include unique risks concerning Defendants' potential inability to pay. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 162 (S.D.N.Y. 2011) (internal quotation marks omitted).

[6] Among other liabilities, Shkreli was recently ordered to pay $64.6 million in disgorgement to the plaintiffs in the Government Action. *See* Government Action, Shkreli Order, ECF No. 865 (Jan. 14, 2022). Plaintiff anticipates that this disgorgement award will exhaust Shkreli's resources, making it unlikely that he would be able to satisfy a competing judgment in this action.

## II.  The Settlement Class Should be Certified Pursuant to Rule 23.

Plaintiff and the Defendants have agreed, subject to the Court's review and approval, to certification of the following Settlement Class for purposes of the Settlement:

> All entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim between August 7, 2015 and January 28, 2022.

The Second Circuit has long supported certifying classes in the context of a class action settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also, In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 451 (S.D.N.Y. 2004); *In re Baldwin-United Corp.*, 105 F.R.D. 475, 478 (S.D.N.Y. 1984). A court may certify a settlement class where, as here, the proposed class satisfies the four requirements of Rule 23(a), as well as one of the three subsections of Rule 23(b). *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 110 (S.D.N.Y. 2010). When considering certification in the context of a proposed settlement, courts enjoy broad discretion and "must take a liberal rather than restrictive approach." *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157-58 (E.D.N.Y. 2009) (citation omitted).

The proposed Settlement Class meets the requirements for certification. Numerous courts, including courts in this Circuit, have certified indirect purchaser classes in analogous antitrust cases involving similar plaintiffs, similar proposed classes, and similar theories of harm relating to overcharges arising from delayed generic competition, both for purposes of litigation and for settlement.[7]  The Settlement Class here similarly merits certification.

---

[7] *See, e.g., In re Ranbaxy Generic Drug Application Antitrust Litig.,* 338 F.R.D. 294, 306 (D. Mass. 2021) (litigation class); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 39 (E.D.N.Y. 2020) (litigation class); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 406 (D.R.I. 2019) (litigation class); *In re Aggrenox Antitrust Litig.*, No. 3:14-MD-02516 (SRU), 2018 WL 1183734 (D. Conn. Mar. 6, 2018) (settlement class); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at \*23 (N.D. Cal. Feb. 21, 2017) (litigation class); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017

### A. The Settlement Class Satisfies the Prerequisites of Rule 23(a).

Class certification is appropriate under Rule 23(a) if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

#### 1. Numerosity.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be impracticable. "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *In re IPO III*, 260 F.R.D. at 90. Precise quantification of class members is not necessary; the court may make reasonable assumptions to support a finding of numerosity. *Sims v. Bank of Am. Corp.*, No. 06-CV-5991 (CPS) (JMA), 2008 WL 479988, at *6 (E.D.N.Y. Feb. 19, 2008). While forty class members presumptively satisfies Rule 23(a)(1), a class may contain fewer members. *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). The Settlement Class easily satisfies the numerosity requirement. The Settlement Class consists of all third-party payer entities that indirectly purchased and/or provided reimbursement for Daraprim over a six-year period. Based on the data available, Interim Lead Counsel estimates that the Settlement Class consists of

---

WL 4621777, at *20 (D. Mass. Oct. 16, 2017) (litigation class); *In re DDAVP Indirect Purchaser Antitrust Litig.*, No. 05 CIV. 2237 (CS), 2013 WL 12461392, at *1-*2 (S.D.N.Y. Mar. 12, 2013) (settlement class) *aff'd*, No. 05 CIV. 2237 (CS), 2013 WL 10114257 (S.D.N.Y. Dec. 18, 2013); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013) (litigation class), *aff'd sub nom*, *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ; *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 235 (E.D. Pa. 2012) (litigation class); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *11 (D.N.J. Jan. 25, 2011) (litigation class).

at least hundreds, if not thousands, of businesses located throughout the United States. Joinder of such a large number of geographically dispersed entities would be impracticable.

### 2. Commonality.

Rule 23(a)(2) requires a showing that questions of law or fact are common to the class. The commonality requirement is satisfied if the named plaintiff "share(s) at least one question of fact or law with the grievances of the prospective class." *In re Global Crossing*, 225 F.R.D. at 451. The test for commonality is not demanding and is easily met in cases involving anticompetitive conduct. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y.1996) ("*NASDAQ I*").

Here, there are numerous common questions of law and fact. They include, among many other issues: (1) whether Defendant's resale restrictions, exclusive supply agreement, and data blocking agreements violated antitrust and consumer protection laws; (2) whether Defendants possessed monopoly power in the market for Daraprim; (3) whether Plaintiff and Settlement Class Members suffered antitrust injury; and (4) the extent of Plaintiff and Settlement Class Members' damages. Because each of these question are common to the Settlement Class, Rule 23(a)(2) is satisfied.

### 3. Typicality.

Rule 23(a)(3) requires that the class representative's claims be typical of the claims of the class. Typicality is satisfied when "each class member's claim arises from the same course of events[], and each class member makes similar legal arguments to prove the defendant's liability." *In re IPO III*, 260 F.R.D. at 91 (citing *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007)). "'Since the claims only

need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding.'" *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37. Here, Plaintiff's claims are co-extensive with the Settlement Class's. All Settlement Class Members' claims arise out of the same alleged conduct: Defendant's scheme to thwart generic competition and force Daraprim purchasers to pay artificially inflated prices. Because this common course of anticompetitive conduct underlies all Settlement Class Members' claims, typicality is satisfied.

### 4. Adequacy of Representation.

Under Rule 23(a)(4), the representative parties must fairly and adequately protect the interests of the class. This requirement is met if (1) a plaintiff does not have interests that are antagonistic to those of the class, and (2) the plaintiff's chosen counsel is "qualified, experienced and able to conduct the litigation." *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 103 (2d Cir. 2007) (internal quotation and citation omitted). "Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Dziennik v. Sealift, Inc.*, No. 05-CV-4659 (DLI), 2007 WL 1580080, at *6 (E.D.N.Y. May 29, 2007).

Plaintiff satisfies both prongs of the adequacy test.[8] First, Plaintiff has no actual or potential conflicts with the Settlement Class. Plaintiff and Settlement Class Members all share the same incentive to prove that they were harmed by Defendants' conduct, and Plaintiff has vigorously

---

[8] Accordingly, Plaintiff requests that the Court appoint Plaintiff as representative for the Settlement Class.

pursued this litigation on Settlement Class Members' behalf. Among other things, Plaintiff sat for multiple depositions and produced tens-of-thousands of pages of documents.

Further, Plaintiff's chosen counsel at Robins Kaplan are qualified, experienced, and have effectively prosecuted this litigation to a favorable Settlement. As this Court recognized in appointing them Interim Lead Counsel, *see* ECF Nos. 32-33, the lawyers at Robins Kaplan bring decades of experience litigating antitrust and consumer class actions, including on behalf of third-party payers and other indirect purchasers. As set forth in the attached firm résumé, *see* Steinberg Decl., Exhibit B., Robins Kaplan has obtained over $15 billion in recoveries for antitrust clients, and is recognized as one of the nation's leading plaintiffs' antitrust firms. The biographies of Kellie Lerner and Ben Steinberg, the lawyers from Robins Kaplan who have been leading this case's prosecution, are included on pages 14-19 of Exhibit B. They have committed the resources necessary to effectively and efficiently litigate this case, and will continue to do so until the case's completion. Both prongs of Rule 23(a)(4)'s adequacy requirement are satisfied.

## B.     The Settlement Class Also Satisfies the Requirements of Rule 23(b)(3).

Once Rule 23(a) is satisfied, a party seeking class certification must also satisfy one of the requirements of Rule 23(b). *See Larsen v. JBC Legal Group, P.C.*, 235 F.R.D. 191, 196 (E.D.N.Y. 2006). To certify a class under Rule 23(b)(3), Plaintiff must demonstrate that (i) common issues predominate over individual issues, and (ii) the class action mechanism is superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

### 1.     Common Questions of Law and Fact Predominate.

Predominance exists where "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). To satisfy predominance, "a plaintiff must show that those issues in the proposed action that are subject to generalized proof outweigh those issues that are subject to individualized proof." *In re*

*Salomon Analyst Metromedia Litigation*, 544 F.3d 474, 480 (2d Cir. 2008), *abrogated on other grounds by Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455 (2013). Rule 23(b)(3) "calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maint. Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y. 1977). The existence of individualized issues will not defeat predominance so long as common issues carry greater weight for the case as a whole. *See Sykes v. Mel S. Harris & Assocs. LLC,* 780 F.3d 70, 87 (2d Cir. 2015) ("The mere existence of individual issues will not be sufficient to defeat certification. Rather, the balance must tip such that these individual issues predominate.")

The Settlement Class satisfies Rule 23(b)(3)'s predominance requirement. Plaintiff alleges that Defendants engaged in an anticompetitive scheme that gave rise to both Plaintiff's injuries and the injuries of all other Settlement Class Members. Accordingly, to establish liability, Settlement Class Members will all need to proffer the same evidence and the same legal arguments regarding the anticompetitive nature Defendants' resale restrictions, exclusive supply agreements, and data-blocking practices. *See In re Buspirone Pat. Litig.*, 210 F.R.D. 43, 58 (S.D.N.Y. 2002) ("Proof of the allegedly monopolistic and anti-competitive conduct at the core of the alleged liability is common to the claims of all the plaintiffs."); 6 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 18:25 & n.4 (4th ed. 2002) ("[C]ommon liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

Establishing antitrust impact—*i.e.* the fact of antitrust injury—also presents predominately common issues. Plaintiff alleges that Settlement Class Members suffered antitrust injury in the form of overcharges, measured by the difference between the prices they paid for Daraprim and the prices they would have paid absent Defendants' anticompetitive conduct. In such cases,

predominance is established by proffering a common methodology for showing overcharges across the class, something Plaintiff's expert was in the process of developing at the time of settlement. *See Cordes*, 502 F.3d at 107 ("If [a] single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then … the injury-in-fact question is common to the class.").

Indeed, courts in this Circuit and beyond routinely find that common issues predominate in third-party payer antirust actions alleging the delayed entry of generic drugs, even when class certification is contested. *See, e.g., In re Ranbaxy Generic Drug Application Antitrust Litig.,* 338 F.R.D. 294, 306 (D. Mass. 2021); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 39 (E.D.N.Y. 2020); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 406 (D.R.I. 2019); *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *23 (N.D. Cal. Feb. 21, 2017); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *20 (D. Mass. Oct. 16, 2017); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 179 (D. Mass. 2013), *aff'd sub nom*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015); *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 235 (E.D. Pa. 2012); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2011 WL 286118, at *11 (D.N.J. Jan. 25, 2011).

### 2. A Class Action is the Superior Method of Adjudication.

To satisfy Rule 23(b)(3), the Court must also find that a class action is superior to other methods of fairly and efficiently adjudicating this case. In making this assessment, the Court may weigh factors such as whether class members have an interest in prosecuting separate actions, the extent of any independent litigation already commenced by class members, the desirability of concentrating the litigation in this forum, and any difficulties likely to be encountered in managing a class action. Fed. R. Civ. P. 23(b)(3). Each of these factors supports certifying the Settlement

Class. Resolving this ligation through a class action settlement will conserve judicial resources, reduce costs, achieve efficiencies of scale, and eliminate the possibility of inconsistent rulings. By contrast, there would be minimal benefit for Settlement Class Members to prosecute independent actions because the costs of doing so would likely outweigh any recovery. Indeed, Plaintiff is not aware of any separate actions that have been filed by members of the Settlement Class. Finally, there are no concerns about managing this case as a class action because the Settlement seeks to end this case without further litigation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *In re IPO III*, 260 F.R.D. at 88.

### 3. Interim Lead Counsel Should be Appointed as Settlement Class Counsel.

Under Rule 23(g), a court that certifies a class must appoint class counsel, who is charged with fairly and adequately representing the interests of the class. Fed. R. Civ. P. 23(g)(1)(B). In appointing class counsel, the Court must consider: (i) the work counsel has done in identifying or investigating potential claims; (ii) counsel's experience in handling class actions, other complex litigation, and similar claims; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

The attorneys at Robins Kaplan leading this case satisfy these criteria and should be appointed as counsel for the Settlement Class. As set forth above, *see supra* at § II(A)(4)*,* Robins Kaplan has substantial experience litigating antitrust class actions and was already appointed to serve as Interim Lead Counsel. *See* ECF Nos. 32-33. The Court should appoint Kellie Lerner and Benjamin Steinberg from Robins Kaplan as counsel for the Settlement Class.

### III. The Court Should Approve the Proposed Form and Manner of Notice.

Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice regarding

a proposed settlement is adequate under Rule 23 and due process if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," and can "be understood by the average class member." *Wal-Mart Stores, Inc.*, 396 F.3d at 114-15. In particular, notice of a proposed settlement must:

> clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) and the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). "[F]or due process to be satisfied, not every class member need receive actual notice, as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'" *In re Adelphia Commc'ns Corp. Sec. & Derivatives Litig.*, 271 F. App'x 41, 44 (2d Cir. 2008) (quoting *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir. 1988)).

Plaintiff's proposed Notice Plan was designed with the help of A.B. Data, an industry-leading class-action administration firm that has executed notice plans in hundreds of complex class actions, including dozens of antitrust pharmaceutical cases like this. As described in the accompanying Declaration of Eric J. Miller, A.B Data's Senior Vice President of Case Management, ("Miller Decl."), Plaintiff's proposed Notice Plan provides Settlement Class Members with the best practicable notice under the circumstances and satisfies both Rule 23 and due process.

The Notice Plan provides several methods of notice. First, a Short-Form Notice, attached as Ex. B to the Miller Decl., will be sent via U.S. First Class mail in the form of a postcard (and via email if available) to approximately 42,000 third-party payers and related entities in A.B. Data's propriety third-party payer database (the "TPP Database"). Miller Decl. at ¶ 6. The TPP Database

includes entities like health insurers; health maintenance organizations; self-insured large corporations; labor unions; employee benefit and pension plans; and certain record keepers, like PBMs and third-party administrators—*i.e.*, the types of third-party payers entities that are most likely to be Settlement Class Members. *Id.* The Short-Form Notice contains clear and concise summary information that will inform Settlement Class Members of the proposed Settlement and the options that are open to them.

Second, Plaintiff will utilize an online media campaign and a national press release to supplement direct notice. A banner ad campaign will be purchased on three websites targeted at Settlement Class Members: (1) ThinkAdvisor.com/life-health; (2) SHRM.org and (3) BenefitNews.com. *Id.* at ¶ 7. The Short-Form Notice will also be published as a news release that will be distributed via PR Newswire to the desks of approximately 10,000 newsrooms, including those of print, broadcast, and digital websites across the United States. *Id.* at ¶ 8.

Third, the Long-Form Notice, attached as Ex. C to the Miller Decl., will be prominently posted on a case-specific website for this matter. *Id.* at ¶ 10. The website will provide, among other things, the Long-Form Notice, a summary of the case, all relevant pleadings and orders, important dates, and any pertinent updates concerning the case and the Settlement. *Id.* The Long-Form Notice will fairly, clearly, and concisely inform, in plain and easily understood language: (i) the nature of the action; (ii) the definition of the Settlement Class; (iii) the Settlement's benefits; (iv) that a Settlement Class Member may object to the Settlement and/or enter an appearance through an attorney; (v) that the Court will exclude from the Settlement Class any member who requests exclusion; (vi) the time and manner of requesting exclusion; (vii) the binding effect of a class judgment on members of the Settlement Class; (viii) the date, time, and place of the Final Fairness Hearing; and (ix) how to get more information.

Both notices have been drafted to explain the Settlement in clear and easy-to-understand terms and will be targeted to the Settlement Class through a strategic, multi-media-channel approach. Accordingly, the Notice Plan adequately apprises the Settlement Class of the terms of the proposed Settlement and sufficiently outlines their options, all in a way that can be understood by the average Settlement Class Member. *Wal-Mart Stores, Inc.*, 396 F.3d at 114. The Notice Plan meets the requirements of Rule 23 and should be approved.

## IV.     The Court Should Enter the Proposed Settlement Approval Schedule

In addition to approving the Notice Plan, Plaintiff requests that the Court enter the deadlines set forth in Plaintiff's proposed Settlement Approval Schedule. Under the proposed schedule, the case-specific website will be launched, and the Long-Form Notice will be posted to the website, within 14 days of the entry of an order preliminarily approving the Settlement and the Notice Plan. The mailing of the Short-Form Notice to the TPP Database will  be completed within 21 days of such an order, and notice via digital banner ads and press release will be completed within 45 days of such an order. After such notice is sent, Plaintiff will file a declaration from A.B. Data that notice has been distributed in accordance with the proposed Notice Plan. Settlement Class Members will then have another 21 days to submit exclusion requests before the opt-out deadline. Plaintiff will move for final approval of the Settlement, and for any attorneys' fees, expenses, and service awards, within 14 days after the opt-out deadline. Any oppositions to such motions or objections will be due 21 days later, with Plaintiff filing reply briefs 14 days thereafter. The Court will then hold a final Fairness Hearing at a time of its choosing.

The following chart details the proposed Settlement Approval Schedule, which, if entered, will allow the settlement process to proceed efficiently while ensuring that Settlement Class Members have adequate opportunity to consider the Settlement and exercise their rights.

| Event | Date |
|---|---|
| Deadline to launch case-specific website and post Long-Form Notice | No later than 14 days after entry of preliminary approval order |
| Deadline to complete mailing of Short-Form Notice to entities in the TPP Database | No later than 21 days after entry of preliminary approval order |
| Deadline to complete publication notice via digital banner ads and press release | No later than 45 days after entry of preliminary approval order |
| Deadline for Settlement Class Members to request exclusion from the Settlement (opt-out deadline) | No later than 66 days after entry of preliminary approval order |
| Deadline for Plaintiff to move for final approval of the Settlement and for attorneys' fees, expenses and service awards | No later than 80 days after entry of preliminary approval order |
| Deadline for any objections to the Settlement or oppositions to Plaintiff's motions for final approval and for attorneys' fees, expenses, and service awards | No later than 101 days after entry of preliminary approval order |
| Deadline for Settlement Class Members to submit Claim Forms | No later than 110 days after entry of preliminary approval order. |
| Deadline for Plaintiff to respond to any objections and for Plaintiff's reply in support of motion for final approval and motion for attorneys' fees, expenses, and service awards | No later than 115 days after entry of preliminary approval order |
| Fairness Hearing | At the Court's convenience after Plaintiff's reply in support of final approval |

## V.     The Court Should Approve the Plan of Allocation

Like the settlement as a whole, a plan for allocating settlement funds in a class action must

be fair, reasonable and adequate. *In re Metlife Demutualization Litig.*, 689 F. Supp. 2d 297

(E.D.N.Y. 2010). "The formula established for allocation need only have a reasonable, rational

basis, particularly if recommended by experienced and competent class counsel." *In re Facebook,*

*Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 414 (S.D.N.Y. 2018) (internal quotation

marks omitted), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020). Typically, a *pro rata* allocation is appropriate. *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JO), 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019).

Plaintiff's proposed Plan of Allocation meets this standard and is typical of the allocation plans utilized in other third-party payer class actions. As described in the Miller Decl., the Plan of Allocation will distribute Settlement proceeds *pro rata* based on each Settlement Class Member's qualifying payments for Daraprim in the Indirect Purchaser States during the Settlement Class Period. Miller Decl. at ¶ 13. Specifically, the Settlement proceeds will be allocated: (1) to Settlement Class Members who submit valid claim forms; (2) based on each member's *pro rata* share of qualifying payments for Daraprim; (3) that were made in an Indirect Purchaser State; (4) during the Settlement Class Period; and (5) after deducting any Court-approved attorneys' fees, expenses, and services awards. *Id.* The proposed Claim Form and Plan of Allocation is attached to the Miller Decl. as Appendix A to Exhibit C. Claimants will have the option to submit claim forms to A.B. Data by mail or through a secure website, and any claimant that submits an incomplete claim will be notified and allowed an opportunity to cure any deficiencies. *Id.* at ¶ 14.

## VI. A.B. Data Should be Appointed as the Notice Provider and Claims Administrator

To effectuate the Notice Plan and Plan of Allocation, the Court should appoint A.B. Data as the Notice Provider and Claims Administrator. As discussed above, A.B. Data has extensive experience in class action settlement administration, including in pharmaceutical antitrust class actions. S*ee* Miller Decl. ¶¶ 4-5, Ex. A. A.B. Data has also helped Interim Lead Counsel design the proposed Notice Plan and Plan of Allocation. Appointing A.B. Data as the Notice Provider and

Claims Administrator will ensure that the notice and claims process proceeds smoothly, efficiently, and under the purview of the Court.

## VII.    Huntington National Bank Should Be Appointed as the Escrow Agent

The Settlement Agreement requires the class escrow account to overseen by an independent third party, selected by Interim Lead Counsel, who will serve as the Escrow Agent and remain under the Court's jurisdiction until the Claims Administrator distributes the settlement funds. Steinberg Decl., Ex. A at ¶¶ 60, 89. Interim Lead Counsel has chosen The Huntington National Bank ("Huntington Bank") to serve as the Escrow Agent and requests that the Court appoint Huntington Bank as such. Huntington Bank is the industry-leader in overseeing class action settlement funds and has agreed to serve as the Escrow Agent.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant its unopposed Motion and enter the proposed order attached hereto. Specifically, Plaintiff requests that the Court (1) preliminarily approve the Settlement; (2) certify the Settlement Class for purposes of the Settlement; (3) appoint Kellie Lerner and Benjamin Steinberg from Robins Kaplan as Settlement Class Counsel; (4) appoint Plaintiff as representative for the Settlement Class (5) approve the Notice Plan; (6) enter the proposed Settlement Approval Schedule; (7) approve the Plan of Allocation; (8) appoint A.B. Data as the Notice Provider and Claims Administrator; and (9) appoint Huntington National Bank as the Escrow Agent.

Dated:  January 28, 2022              By: */s/ Benjamin Steinberg*

Kellie Lerner
Benjamin Steinberg (admitted *pro hac vice*)
900 3rd Ave, Suite 1900
New York, NY 10022

Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
bsteinberg@robinskaplan.com

*Counsel for Plaintiff BCBSM, Inc., d/b/a*
*Blue Cross and Blue Shield of Minnesota, and*
*the Proposed Class*