# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BCBSM, INC., d/b/a BLUE CROSS and BLUE SHIELD OF MINNESOTA, on behalf of itself and those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VYERA PHARMACEUTICALS, LLC, PHOENIXUS AG, MARTIN SHKRELI, and KEVIN MULLEADY, <br><br> Defendants. | Case No. 1:21-cv-1884-DLC |

**SETTLEMENT AGREEMENT**

This agreement (the "Settlement Agreement") is made and entered into this 28th day of January, 2022 (the "Execution Date"), by Defendants Vyera Pharmaceuticals, LLC and Phoenixus AG (together, "Corporate Defendants"), Martin Shkreli ("Shkreli"), and Kevin Mulleady ("Mulleady," and collectively with the Corporate Defendants and Shkreli "Defendants") and BCBSM, Inc. ("Plaintiff"), individually and on behalf of a class of indirect purchasers of Daraprim, as defined herein.

WHEREAS, Plaintiff alleges that Defendants engaged in a scheme to thwart generic competition for Daraprim in violation of Sections 1 and 2 of the Sherman Act and various state unfair competition, antitrust, unjust enrichment, and consumer protection laws as set forth in the Amended Consolidated Class Action Complaint (the "Complaint");

WHEREAS, Defendants deny Plaintiff's allegations, have asserted defenses to Plaintiff's claims, and have not conceded or admitted any liability;

-1-

WHEREAS, arm's-length settlement negotiations have taken place between Lead Counsel (as defined herein) and counsel for Defendants, and this Settlement Agreement has been reached as a result of those negotiations;

WHEREAS, Plaintiff and Lead Counsel have conducted an investigation into the facts and the law regarding the claims asserted in the above-captioned litigation pending in the United States District Court for the Southern District of New York, Civil Action No. 1:21-cv-1884-DLC (the "Action") and have concluded that a settlement with Defendants according to the terms set forth below is fair, reasonable, adequate, and in the best interest of Plaintiff and the Settlement Class Members; and

WHEREAS, Defendants believe that they are not liable for the claims asserted and have good defenses to Plaintiff's claims, but nevertheless have decided to enter into this Settlement Agreement in order to avoid further expense, inconvenience, and distraction from litigation; to obtain the releases, orders, and judgment contemplated by this Settlement Agreement; and to put to rest with finality Plaintiff's claims against the Releasees (as defined herein).

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Plaintiff and Defendants that the Action be settled, compromised, and dismissed with prejudice, without costs or expenses to Plaintiff, the Settlement Class Members, or Defendants except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

**A.**    **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.    "API" means any active pharmaceutical ingredient that is used in the manufacture

of a Drug Product.

2.    "Biosimilar" means any biologic Drug Product that is highly similar to, and has no clinically meaningful difference from, an existing FDA-approved biologic Drug Product or that otherwise meets the FDA's criteria for classification as a biosimilar.

3.    "Class Guaranteed Payment" means $7 million ($7,000,000.00) in United States currency from the Corporate Defendants.

4.    "Class Contingent Payments" means 70% of all monies that the Corporate Defendants are required to pay into the Global Settlement Fund pursuant to Section V of the Stipulated Order.

5.    "Class Settlement Amount" means the total of the Class Guaranteed Payment and the Class Contingent Payments, together.

6.    "Class Settlement Fund" means the common fund comprised of the total of the Class Guaranteed Payment and the Class Contingent Payments, together, plus any income or accrued interest earned on that amount.

7.    "Corporate Asset" means any asset of a Corporate Defendant or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by a Corporate Named Defendant. Corporate Asset expressly excludes any inventory, goods or products that are sold or to be sold in the ordinary course of business, including without limitation, any APIs, raw materials, or finished product. Corporate Asset also expressly excludes any unissued shares of equity interests, capital stock, partnership interest, membership or limited liability company interest or similar equity right in one or both of the Corporate Named Defendants or any successor, assign, joint venture, subsidiary, partnership, division, group, or affiliate controlled by any of them.

8.    "Corporate Defendants" means Phoenixus AG and Vyera Pharmaceuticals, LLC

-3-

and their directors, officers, employees, agents, attorneys, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Phoenixus AG or Vyera Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, attorneys, representatives, successors, and assigns of each.

9.     "Corporate Named Defendants" means Phoenixus AG and Vyera Pharmaceuticals, LLC.

10.     "Court" means the United States District Court for the Southern District of New York.

11.     "Customer or Supplier" means a counter-party to a distribution, wholesale, resale, API supply, or Drug Product purchase agreement with a Corporate Defendant.

12.     "Daraprim" means any Drug Product authorized for marketing or sale in the United States pursuant to FDA Authorization NDA 008578, and any supplements, amendments, or revisions to this NDA.

13.     "Defendants" means the Corporate Defendants and Shkreli and Mulleady.

14.     "Development" means all preclinical and clinical research and development activities related to a Drug Product, including discovery or identification of a new chemical entity, test method development, all studies for the safety or efficacy of a Drug Product, toxicology studies, bioequivalence and bioavailability studies, pharmaceutical formulation, process development, manufacturing scale-up, development-stage manufacturing, quality assurance/quality control development, stability testing, statistical analysis and report writing, for the purpose of obtaining any and all FDA Authorizations necessary for the manufacture, use, storage, import, export, transport, promotion, marketing, labeling, distribution, and sale of a Drug Product, and regulatory affairs related to the foregoing.

15.     "Drug Product" means any product that is the subject of an FDA Authorization.

16.     "Escrow Account" means the account with the Escrow Agent that holds the Class Settlement Fund.

17.     "Escrow Agent" means the bank into which the Class Settlement Fund shall be deposited and maintained as set forth in Section L of this Settlement Agreement.

18.     "Execution Date" means the date on which this Settlement Agreement is entered into and executed by all Settling Parties.

19.     "Exempted Company" means any Pharmaceutical Company owned or controlled by Mulleady (including Prospero) whose business is limited to a Therapeutic Equivalent of Thiola and/or the PKAN Product.

20.     "FDA" means the United States Food and Drug Administration.

21.     "FDA Authorization" means any of the following applications:

(a)     An application filed or to be filed with the FDA pursuant to 21 C.F.R. Part 314 et seq., including "New Drug Application" ("NDA"), "Abbreviated New Drug Application" ("ANDA"), "Supplemental New Drug Application" ("SNDA"), or "Marketing Authorization Application" ("MAA"), and all supplements, amendments, and revisions thereto, any preparatory work, registration dossier, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto; or

(b)     A "Biologic License Application" ("BLA") filed or to be filed with the FDA pursuant to 21 C.F.R. 601.2, et seq., and Section 351 of the Public Health Service Act, and any NDA deemed to be a BLA by the FDA,

and all supplements, amendments, revisions thereto, any preparatory work, drafts and data necessary for the preparation thereof, and all correspondence between the holder and the FDA related thereto.

22. "Final Approval" means that the approval of the Settlement Agreement by the Court has become final when (a) the Court has entered (i) a final order certifying the Settlement Class and approving this Settlement Agreement under Federal Rule of Civil Procedure 23(e), and (ii) a final judgment dismissing the Action against Defendants with prejudice and without costs; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review. Neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be taken into account in determining the above-stated times.

23. "Government Action" means the related litigation *FTC, et al. v. Vyera Pharmaceuticals, et al.,* No. 1:20-cv-0706-DLC (SDNY).

24. "Government Plaintiffs" means the Federal Trade Commission and the State Plaintiffs (as defined herein).

25. "Global Settlement Fund" means the settlement fund referenced in Section V of the Stipulated Order.

26. "GPO" means any group purchasing organization, an entity that negotiates prices of Drug Products on behalf of member healthcare providers, including hospitals, ambulatory care facilities, physician practices, nursing homes, and home health agencies.

27. "Indirect Purchaser States" means Arizona, Arkansas, California, District of

Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, and Wisconsin.

28.    "Lead Counsel" means the law firm Robins Kaplan LLP.

29.    "Net Proceeds" means proceeds after deducting direct transaction costs paid to Third Parties (i.e., sales commissions, advisor fees, and other costs incurred solely due to the underlying transaction).

30.    "Opt-Out Deadline" means the deadline set by the Court for the timely submission of requests by Settlement Class Members to be excluded from the Settlement Class.

31.    "Ownership Interest" means any voting or non-voting stock, share capital, or equity in a Person (other than an individual). Ownership Interest shall not include any unexercised options or other unexercised instruments that are convertible into any voting or nonvoting stock.

32.    "Person" means any individual, partnership, joint venture, firm, corporation, association, trust, unincorporated organization, or other business or government entity, and any subsidiaries, divisions, groups, or affiliates thereof.

33.    "Pharmaceutical Company" means any Person (other than an individual) that is engaged in the research, Development, manufacture, commercialization, or marketing of any Drug Product.

34.    "PKAN Product" means the chemical compound that, as of the Execution Date, Prospero is involved in the Development of as a potential treatment for pantothenate kinase-associated neurodegeneration ("PKAN").

35.    "Plaintiff" means BCBSM, Inc.

36.    "Priority Review Voucher" means a voucher issued by the FDA that entitles a Drug Product to receive expedited regulatory review.

37.    "Prospero" means Prospero Pharmaceuticals, LLC, its directors, officers, employees, agents, representatives, successors, and assigns; and the joint ventures, subsidiaries, partnerships, divisions, groups, and affiliates controlled by Prospero Pharmaceuticals, LLC, and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

38.    "Releasees" means Defendants and any of their current or former parents, subsidiaries, divisions, affiliates, joint ventures, stockholders, officers, directors, management, supervisory boards, accountants, insurers, reinsurers, general or limited partners, employees, agents, trustees, associates, attorneys and any of their legal representatives, as well as the predecessors, heirs, executors, administrators, successors and assigns of each of the foregoing.

39.    "Releasors" means Plaintiff and any member(s) of the Settlement Class, including any of their current or former officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs executors, administrators, predecessors, successors and assigns, acting in their capacity as such.

40.    "Settlement" means the settlement of the Action contemplated by this Settlement Agreement.

41.    "Settlement Class Period" means the period from and including August 7, 2015 to and including the Execution Date.

42.    "Settlement Class" is defined as follows:

All entities that, for consumption by their members, employees, insureds, participants, or beneficiaries, and not for resale, indirectly purchased, paid and/or provided reimbursement for some or all of the purchase price of Daraprim during the Settlement Class Period.  Excluded from the Settlement Class are the following:

(a)  Natural person consumers;

(b)  Defendants and their employees, affiliates, parents, and subsidiaries, whether or not named in the Complaint;

(c)  All federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans;

(d)  Fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); and

(e)  Judges assigned to this case and any members of their immediate families.

43.     "Settlement Class Member" means a member of the Settlement Class that does not timely and validly elect to be excluded from the Settlement Class.

44.     "Settling Parties" means Plaintiff and Defendants.

45.     "State Plaintiffs" means the states or commonwealths of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia.

46.     "Stipulated Order" means the Stipulated Order for Permanent Injunction and Equitable Monetary Relief that was entered in the Government Action on December 7, 2021.

47.     "Therapeutic Equivalent" means a Drug Product that is classified by the FDA as being therapeutically equivalent to another Drug Product because, among other criteria, both Drug Products contain identical amounts of an API in the identical dosage form and route of administration, meet compendial or other applicable standards of strength, quality, purity, and identity, and they are classified by the FDA as bioequivalent.

48.     "Thiola" means the Drug Products authorized for marketing or sale in the United States pursuant to FDA Authorizations NDA 019569 or NDA 211843, and any supplements,

amendments, or revisions to these NDAs.

49.    "Third Party" means any Person that is not a Corporate Defendant or an entity under common management, direction, or control of a Corporate Defendant.

**B.**    **Stipulation to Class Certification**

50.    The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied and that subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Defendants. The Settling Parties stipulate and agree to the certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not receive Final Approval or otherwise be rescinded, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void, and no party may cite or refer to such stipulation or to the Court's approval of the Settlement Class as persuasive or binding authority with respect to any motion to certify any such class or any Defendants' motion opposing such certification. Defendants expressly reserve their rights to oppose class certification should this Settlement not receive Final Approval.

**C.**    **Approval of this Settlement Agreement and Dismissal of the Action**

51.    The Settling Parties agree to make reasonable best efforts to take actions to effectuate this Settlement Agreement and shall cooperate to promptly seek and obtain the Court's preliminary and Final Approval of this Settlement Agreement, including without limitation seeking the Court's approval of procedures (including the dissemination of class notice under Federal Rules of Civil Procedure 23(c) and (e), and scheduling a final fairness hearing) to obtain Final Approval of the Settlement and the final dismissal with prejudice of the Action as to

Defendants.

52.     On or before January 28, 2022, Plaintiff shall submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Preliminary Approval Motion"). Plaintiff shall also move the Court at the appropriate time to authorize dissemination of notice to the Settlement Class. If the Settlement is preliminarily approved by the Court, Plaintiff shall provide notice to the Settlement Class in accordance with Federal Rule of Civil Procedure 23 and Due Process.

53.     Within ten (10) calendar days after this Settlement Agreement and the Preliminary Approval Motion are filed with the Court, the Corporate Defendants shall cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

54.     After the Court preliminarily approves the Settlement and notice is disseminated to the Settlement Class, Plaintiff shall seek Final Approval of the Settlement and entry of a final judgment order as to Defendants, the text of which shall be furnished to Defendants in advance for review. Plaintiff will consider in good faith any reasonable and timely proposed edits by Defendants. The final judgment order shall include the following provisions:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b)(3), solely for the purpose of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23(e), and directing the consummation of the Settlement according to its terms;

(c) directing that the Action be dismissed with prejudice in its entirety and, except as provided for herein, without costs;

(d) stating that each Settling Party has complied fully with the strictures of Rule 11 of the Federal Rules of Civil Procedure;

(e) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including its administration and consummation, to the Court; and

Plaintiff shall inform Defendants of the date on which Plaintiff will move for Final Approval and furnish the proposed text of the final judgment order to Defendants at least ten (10) calendar days before filing the motion.

55.    On the Execution Date, the Settling Parties shall be bound by the terms of this Settlement Agreement, and this Settlement Agreement shall not be rescinded except in accordance with Section M.

56.    Neither this Settlement Agreement (whether or not it becomes final) nor the final judgment, nor any and all negotiations, documents, and discussions associated with them, shall be deemed or construed to be an admission by Defendants, or evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by Defendants, or of the truth of any of the claims or allegations contained in any complaint or any other pleading filed in the Action; and evidence thereof shall not be discoverable or used directly or indirectly, in any way, whether in the Action, or in any other arbitration, action or proceeding whatsoever, against Defendants. Neither this Settlement Agreement, nor any of its terms and provisions, nor any of the negotiations or proceedings connected with it, nor any other action taken to carry out this Settlement Agreement by Defendants, shall be referred to, offered as evidence, or received in evidence in any pending or future civil, criminal, or administrative action, arbitration, or proceedings, except in a proceeding to enforce this Settlement Agreement, or to defend against the assertion of Released Claims (as defined herein), or as otherwise required by law.

D.      <u>**Releases, Discharge, and Covenant Not to Sue**</u>

57.     Upon Final Approval of the Settlement and in consideration of the payment of the Class Settlement Amount and the injunctive relief set forth herein, Releasees shall be fully and finally released and forever discharged by Releasors from any and all manner of claims, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, including costs, expenses, penalties and attorneys' fees, accrued in whole or in part, in law or equity that Releasors ever had, now have, or hereafter can, shall or may have, indirectly, representatively, derivatively or in any other capacity, arising out of or relating in any way to any claim under federal or state laws that was alleged or could have been alleged in the Action that arise out of, are based upon or related to the allegations in any complaint filed in the Action, prior to the date of the Settlement Agreement when entered ("Released Claims"); provided however that Releasors shall not release (1) any federal or state antitrust claim based on direct purchases of Daraprim from a Defendant (2) any claim involving any negligence, personal injury, breach of contract, bailment, failure to deliver lost goods, damaged or delayed goods, product defect, securities, or similar claims with respect to the purchase of Daraprim; or (3) any claim under the laws of any state or territory other than the Indirect Purchaser States. Releasors will covenant and agree that, upon Final Approval of the Settlement, each shall not sue or otherwise seek to establish or impose liability against any of Releasees based, in whole or in part, on any of the Released Claims.

58.     Releasors will expressly waive, release and forever discharge any and all provisions, rights, and benefits conferred by section 1542 of the California Civil Code, and any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable or otherwise equivalent to section 1542. Each Releasor may hereafter

discover facts other than or different from those the Releasor knows or believes to be true with respect to the claims that are released pursuant to the provisions of Paragraph 57, but each Releasor hereby expressly waives and fully, finally, and forever settles and releases, upon this Settlement Agreement becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim with respect to the subject matter of the provisions of Paragraph 57, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

59.    The Settlement, once concluded, shall include a dismissal with prejudice of the Action. Upon Final Approval of the Settlement, Defendants will release Releasors from any claims relating to the institution or prosecution of the Action. No Party will be deemed to release any claims to enforce the settlement.

**E.    Payment of the Global Settlement Amount and Class Settlement Amount**

60.    The Settling Parties acknowledge that on January 13, 2022 the Corporate Named Defendants paid $10 million ($10,000,000) into the Global Settlement Fund pursuant to the Stipulated Order, of which $7 million ($7,000,000) constitutes the Class Guaranteed Payment, which shall be transferred from the Global Settlement Fund into the Escrow Account for the benefit of the Settlement Class. Lead Counsel shall reach agreement with the State Plaintiffs to cause the Class Guaranteed Payment, and any then-due Class Contingent Payments, to be transferred from the Global Settlement Fund to the Escrow Account within fifteen (15) business days of the Execution Date. Lead Counsel shall provide complete IRS Form W-9 and wire transfer, ACH transfer, EFT and/or check payment instructions to the Escrow Agent (including contact information and a physical address) at least ten (10) calendar days before the date of such transfer. As provided in Section V(D) of the Stipulated Order, the Global Settlement Fund shall be used "to

-14-

satisfy the amount of any settlement reached" in this Action, which includes but is not limited to the amount of the Class Guaranteed Payment.  In the event the Class Guaranteed Payment is paid into the Global Settlement Fund but not timely deposited into the Escrow Account, Class Counsel and the Corporate Defendants shall request that the Court direct the Class Guaranteed Payment to be deposited into the Escrow Account, in compliance with Section V(D) of the Stipulated Order.

61.     As set forth in the Stipulated Order, the Corporate Named Defendants shall make additional payments, not to exceed $30 million ($30,000,000) in the aggregate, to the Global Settlement Fund, as follows:

(a) For any Corporate Asset other than a Priority Review Voucher, the Corporate Named Defendants shall: (1) Pay 20% of the total Net Proceeds from the sale, license, transfer, or other monetization of an asset that results from a transaction that is executed within 5 years of December 7, 2021; and (2) Pay 20% of the total Net Proceeds from a transaction monetizing the remaining royalty stream related to Ketamine assets that is executed within 5 years of December 7, 2021. The Corporate Named Defendants must transfer monies related to any such transactions into the Global Settlement Fund within 30 days of its receipt; for example, in a transaction with an upfront payment and royalty stream, the Corporate Named Defendants would pay 20% of the net upfront payment within 30 days of receiving the upfront payments and would pay 20% of any additional royalties within 30 days of when the royalties are received by either Corporate Named Defendant; provided, however, the Corporate Named Defendants shall not be required to make payments under this Paragraph 61(a) after: (i) their total payments to the Global Settlement Fund under this Paragraph 61(a) equal $15 million, or (ii) their total combined

payments to the Global Settlement Fund under Paragraphs 61(a) and 61(b) equal $30 million.

(b) For any Priority Review Voucher that is a Corporate Asset, the Corporate Named Defendants shall pay 20% of the Net Proceeds received from the sale, license, transfer, or other monetization of the Priority Review Voucher that results from a transaction executed within 10 years of December 7, 2021; provided, however, that the Corporate Named Defendants shall not be required to make payments under this Paragraph 61(b) after their total payments to the Global Settlement Fund under Paragraphs 61(a) and 61(b) equal $30 million.

(c) No later than 30 days after any transaction for which the Corporate Named Defendants are required to make additional payments to the Global Settlement Fund under this Paragraph 61, the Corporate Named Defendants shall provide notice to Lead Counsel of the transaction. The notice shall include a description of the transaction and its financial terms, contact information for each party to the transaction (including the name, phone number and email address of a representative of the party with knowledge of the transaction), and a copy of all agreements regarding the transaction. For the avoidance of doubt, nothing in this Paragraph shall require the Corporate Named Defendants to provide Lead Counsel with anything beyond copies of the information that they are required to provide to the Government Plaintiffs in accordance with Paragraph V(C)(3) of the Stipulated Order.

62.     Seventy percent (70%) of all additional payments that the Corporate Named Defendants are required to make into the Global Settlement Fund under Paragraph 61 constitute the Class Contingent Payments to be transferred into the Escrow Account for the benefit of the

Settlement Class. Lead Counsel shall reach agreement with the State Plaintiffs to cause the Class Contingent Payments to be transferred from the Global Settlement Fund into the Escrow Account promptly after being deposited into the Global Settlement Fund. Any material failure by the Corporate Named Defendants to make payments into the Global Settlement Fund as required under Paragraph 61 shall constitute a breach of this Settlement Agreement.

63.     The Corporate Named Defendants' obligations to pay money into the Global Settlement Fund set forth in this Section E shall bind Vyera Pharmaceuticals, LLC and Phoenixus AG, and any predecessor or successor entity, including but not limited to any subsidiary, division, or affiliate controlled by the Corporate Named Defendants, whether private or publicly-traded.

64.     The Class Settlement Amount, which is comprised of the Class Guaranteed Payment and the Class Contingent Payments, is the maximum amount to be paid by the Defendants to the Escrow Account in connection with the settlement of the Class Action and is inclusive of all fees, expenses, and any other payments to be made by the Defendants, including but not limited to the full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, service awards, attorneys' fees, and reimbursement of all actual expenses of the Action, any other litigation costs of Plaintiff, and all applicable taxes, if any, assessable on the Class Settlement Fund or any portion thereof (subject to Court approval as appropriate). In no event shall the Corporate Named Defendants be required to pay more than $40 million ($40,000,000) into the Global Settlement Fund. Neither Shkreli nor Mulleady bear any responsibility for payment of any portion of the Class Settlement Amount.

**F.     Injunctive Relief as to the Corporate Defendants**

65.     The Settling Parties acknowledge that the Corporate Defendants are subject to certain injunctive terms set forth in the Stipulated Order. The Settling Parties expressly agree that

the injunctive relief terms set forth in this Settlement Agreement are not intended to, and shall not, exceed the requirements of the injunctive terms set forth in the Stipulated Order, which terms expire ten years after the date of the Stipulated Order.

66.    The Corporate Defendants, directly or through any Person, shall not enter into or enforce any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

(a) Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company; provided, however, that this provision does not prohibit the Corporate Defendants from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product; or

(b) Any manufacturer, seller, supplier, or distributor of an API to sell or provide that API to a Pharmaceutical Company; provided, however, that this provision does not prohibit a Corporate Defendant from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the Corporate Defendant or restrict the Person's freedom to sell the API to any other Person, and provided further, if the Corporate Defendants have no other supply agreement for a particular API, this

provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if the Corporate Defendants bear at least 50% of the direct costs of developing the API; or

(c) Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering trends, to a Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

67. The Corporate Defendants shall not hire, appoint as an officer or director, or otherwise do business with Mulleady in any manner that violates Section G of this Settlement Agreement and shall not hire, appoint as an officer or director, or otherwise do business with Shkreli in any manner that violates any provision or restriction in any final, non-appealable judgment entered by the Court.

68. The Corporate Defendants shall provide written notification in the form of Appendix A to the Stipulated Order to all new Customers and Suppliers (as those terms are defined in the Stipulated Order) that have not previously received such notification; provided, however, the Corporate Defendants need not provide notice to Customers entering into an agreement to purchase generic prescription drugs so long as the agreement does not also include branded prescription drugs or an API.

69. So long as a Corporate Defendant markets a Drug Product, they shall, at the request of a Pharmaceutical Company, sell the Drug Product to that Pharmaceutical Company for use in Development of a Therapeutic Equivalent or Biosimilar of the Drug Product in accordance with the following:

(a) The quantity sold shall be at least as much as the Pharmaceutical Company, in its reasonable judgment, needs to conduct its Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

(b) The Drug Product is delivered no later than 30 days after the Corporate Defendant receives a purchase order; and

(c) The Corporate Defendants shall charge the Pharmaceutical Company a price that is no greater than the wholesale acquisition cost of the Drug Product.

70.      The Corporate Defendants shall continue to market and sell Daraprim until the earliest to occur of the following:

(a) At least three Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each has made at least one commercial sale of the Therapeutic Equivalent;

(b) At least two Pharmaceutical Companies that are Third Parties have obtained FDA Authorization to market and sell a Therapeutic Equivalent of Daraprim and each of these Pharmaceutical Companies has made uninterrupted commercial sales of the Therapeutic Equivalent for a period of at least 9 months;

(c) The Corporate Defendants exhaust their supply of pyrimethamine API, the API is no longer available, or the API is only available at a cost or in quantities that make it unprofitable to continue marketing and selling Daraprim, and the Corporate Defendants notify the Government Plaintiffs of their inability to secure a supply of pyrimethamine and the reasons therefore;

(d) An independent auditor, selected by the Corporate Defendants and approved by the Government Plaintiffs, verifies that the operating expenses (including variable and fixed costs) for Daraprim exceeded net revenues generated through the sale of Daraprim for at least two consecutive quarters;

(e) The Corporate Defendants lose FDA Authorization to continue marketing Daraprim;

(f) Three years after December 7, 2021; or

(g) The Corporate Defendants (i) notify the Government Plaintiffs of their intent to discontinue marketing Daraprim; (b) sell their Daraprim business to an acquirer ("Acquirer") and in a manner that is acceptable to the Government Plaintiffs; (c) maintain the viability, marketability, and competitiveness of the Daraprim business until the sale of the Daraprim business is completed; and (d) provide the Acquirer with the assistance and information necessary to enable the Acquirer to obtain the necessary approvals to manufacture, market, and sell Daraprim in commercial quantities, and to supply the Acquirer with sufficient quantities of Daraprim to meet the Acquirer's commercial needs until the Acquirer is independently able to manufacture and market commercial quantities of Daraprim.

## G.    Injunctive Relief as to Mulleady

71.    The Settling Parties acknowledge that Mulleady is subject to certain injunctive terms set forth in the Stipulated Order. The Settling Parties expressly agree that the injunctive relief terms set forth in this Settlement Agreement are not intended to, and shall not, exceed the

requirements of the injunctive terms set forth in the Stipulated Order, which terms expire ten years after the date of the Stipulated Order.

72.    For a period ending 7 years after December 7, 2021, Mulleady shall not directly, or through any other Person:

  (a) Participate in the research, Development, manufacture, commercialization, distribution, marketing, importation, or sale of a Drug Product or API, including participating in the formulation, determination, or direction of any business decisions of any Pharmaceutical Company;

  (b) Exercise control over the activities, conduct, board, or management of any Pharmaceutical Company;

  (c) Serve as an officer or director of any Pharmaceutical Company;

  (d) Enter into any agreements, whether oral or written, concerning how to vote his shares in any Pharmaceutical Company; and

  (e) Call an Extraordinary General Meeting at Phoenixus or Vyera either on his own or as part of a group doing so.

73.    *Provided*, *however*, Mulleady may exercise all other rights to which he is entitled as a shareholder of an Exempted Company and/or any Pharmaceutical Company to the extent such shareholding is permitted by Paragraph 76. Nothing in Paragraph 72 shall preclude Mulleady from expressing his own views on his own behalf as a shareholder concerning the business of any such Pharmaceutical Company.

74.    Further, it is not a violation of Paragraph 72 for Mulleady to be employed by, consult with, or act as an officer or director of Phoenixus or Vyera, and in so doing take the actions set forth in Paragraph 72(a) to (c), so long as: (i) Mulleady does not own or control any Ownership

Interest in Phoenixus or Vyera, either directly or through any other Person, and (ii) Mulleady provides prior notification to the Government Plaintiffs of any proposed involvement in or engagement with Phoenixus or Vyera pursuant to Paragraph VI.C of the Stipulated Order.

75.    It is not a violation of Paragraph 72 for Mulleady to be employed by, consult with, or act as an officer or director of an Exempted Company and/or take the actions set forth in Paragraphs 72(a) to (d) at an Exempted Company, so long as:

   (a) The Exempted Company's business is limited to (i) a Therapeutic Equivalent of Thiola and/or (ii) the PKAN Product, and the Exempted Company does not have an interest or role in, and is not engaged in any activities related to, any other Drug Product;

   (b) The Exempted Company's financial interest in any Therapeutic Equivalent of Thiola is limited to a passive royalty right;

   (c) The Exempted Company does not have any authority, control, or other role in, or engage in any activities related to, the commercialization, marketing, sales, distribution, or pricing of any Therapeutic Equivalent of Thiola;

   (d) Prior to the filing of an FDA Authorization, the Exempted Company fully divests itself of any control or authority to commercialize, market, sell, distribute, or price any PKAN Product; and

   (e) Mulleady complies with the prior notification provisions set forth in Paragraphs VI.D and VIII.B of the Stipulated Order.

76.    Mulleady shall not acquire, hold, or vote more than 8% of the Ownership Interest (based on the latest information available to shareholders from the issuer) in any Pharmaceutical Company (other than an Exempted Company), either directly or through any other Person;

-23-

provided however, it shall not be a violation of this Paragraph 76 if Mulleady passively obtains more than 8% of the Ownership Interest in a Pharmaceutical Company through means other than exercising options or otherwise purchasing the Ownership Interest so long as Mulleady (i) reduces his Ownership Interest in such Pharmaceutical Company to 8% or lower within 10 months, and (ii) in the interim only votes up to 8% of the Ownership Interest in the Pharmaceutical Company; provided further, this Paragraph does not permit Mulleady to acquire, hold, or vote any Ownership Interest in Phoenixus or Vyera while Mulleady is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera; and provided finally, Mulleady may exercise the rights to which he is entitled as a shareholder of a Pharmaceutical Company (other than those prohibited by Paragraphs II.C.4 and 5 of the Stipulated Order) so long as his Ownership Interest in such company does not exceed the limits in this Paragraph 76.

77.     If Phoenixus or Vyera is found in violation of Section F of this Settlement Agreement, it shall be presumed that Mulleady has also violated the terms of this Settlement Agreement, but only if he is employed by, consulting with, or acting as officer or director for Phoenixus or Vyera at the time the violation occurs. Mulleady may rebut this presumption by proving to the Court by a preponderance of the evidence that he did not have any knowledge of, involvement in, or in any manner facilitate, the violation of this Order.

78.     Mulleady, any Exempted Company, and any other company Mulleady controls, shall not propose, negotiate, review, enter into, be a party to, or enforce, either directly or through any other Person, any contract, arrangement, mutual understanding, or agreement that prohibits, or in any manner interferes with or restricts the ability of:

(a) Any purchaser (including hospitals and pharmacies), reseller, wholesaler, or distributor of a Drug Product to provide that Drug Product to a Pharmaceutical

Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of that Drug Product by that Pharmaceutical Company; provided, however, this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering an agreement with a distributor that restricts that distributor to certain channels of sale so long as it permits the distributor to sell the Drug Product to a Pharmaceutical Company or its agent(s) or representative(s) for the purposes of the Development of a Therapeutic Equivalent or Biosimilar of the Drug Product;

(b) Any manufacturer, seller, supplier, or distributor of any API to provide that API to a Pharmaceutical Company; provided, however, this provision does not prohibit Mulleady, any Exempted Company, or any other company Mulleady controls from entering a contract to purchase all of its needs for a particular API from any Person so long as the contract does not require the Person to supply the API exclusively to the company or restrict the Person's freedom to sell the API to any other Person; and provided further, if Mulleady, any Exempted Company, or any other company Mulleady controls has no other supply agreement for the particular API, this provision will not apply to any arrangement to obtain API from a Person who has not previously manufactured the API if Mulleady, the Exempted Company, or any company he owns or controls bears at least 50% of the direct costs of developing the API; or

(c) Any distributor, wholesaler, pharmacy, or GPO of a Drug Product to sell or otherwise provide data related to the sales or distribution of any Drug Product, such as sales numbers and volume, or other sales variables such as ordering trends, to a

Person engaged in the business of purchasing, aggregating, and selling sales and distribution data on Drug Products.

**H.    Injunctive Relief as to Shkreli**

79.    The Settling Parties acknowledge that a bench trial was conducted against Shkreli in the Government Action and that the Court entered an Opinion and Order against Shkreli on January 14, 2022, which stated that Shkreli would be banned for life from participating in the pharmaceutical industry in any capacity. Upon the entry of a final judgment against Shkreli in the Government Action (the "Final Shkreli Judgment"), Shkreli agrees to be bound, under this Settlement Agreement, to the same injunctive terms contained in the Final Shkreli Judgment, unless the Final Shkreli Judgment is stayed pending appeal, in which case the Final Shkreli Judgment will not be enforceable against Shkreli under this Settlement Agreement unless and until such stay is lifted. Subject to any such stay, all injunctive terms of the Final Shkreli Judgment shall become enforceable terms of this Settlement Agreement and any material violation of those injunctive terms will be a violation of this Settlement Agreement.

80.    If the Final Shkreli Judgment is overturned or modified, Shrekli shall be bound under this Settlement Agreement to the same injunctive terms of any final, non-appealable judgment entered in the Government Action, and any material violation of those injunctive terms will be a violation of this Settlement Agreement.

**I.    Compliance Reporting**

81.    The Corporate Defendants and Mulleady shall submit to Lead Counsel copies of the verified written reports ("Compliance Reports") required by Sections VII.A-F of the Stipulated Order, and the Corporate Defendants and Mulleady shall also provide to Lead Counsel copies of the notifications required by Sections VIII.A-B, respectively, of the Stipulated Order. All such

reports and notifications shall be shared on an "outside counsel eyes only" basis and be used by Lead Counsel solely for assessing compliance with the Settlement Agreement. For the avoidance of doubt, nothing in this Paragraph shall require the Corporate Defendants or Mulleady to provide Lead Counsel with anything beyond the copies of the information, reports, and/or notifications that they are required to provide to the Government Plaintiffs in accordance with Sections VII.A-F and Sections VIII.A-B of the Stipulated Order; however, in the event that Lead Counsel has a good faith belief that a Corporate Defendant is not in compliance with the Settlement Agreement, the Corporate Defendants agree to work cooperatively with Lead Counsel to provide Lead Counsel all relevant written communications, internal memoranda, reports, and recommendations referenced in Section VII.E of the Stipulated Order.

82.    Upon the entry of a final, non-appealable judgment against him in the Government Action, Shkreli shall submit to Lead Counsel any Compliance Reports, or other written reports, that he may be required to make to the Government Plaintiffs in the Government Action for a period of seven years following the Execution Date.

83.    All Compliance Reports and notifications submitted by Shkreli shall be shared on an "outside counsel eyes only" basis and be used by Lead Counsel solely for assessing compliance with the Settlement Agreement.

**J.    <u>Bankruptcy Protection</u>**

84.    In consideration for the Settlement of this matter, one or both Corporate Named Defendants, on behalf of themselves and their successors, and any subsidiaries, and affiliates controlled by them, whether private or publicly-traded, shall sign within 30 days of the Execution Date a collateral agreement (as agreed to by Lead Counsel and the Corporate Named Defendants) (the "Class Collateral Agreement") to secure the contingent debt described in Paragraph 61.   The

Class Collateral Agreement shall only become effective upon Final Approval and shall provide as follows: (1) the Corporate Named Defendants give and grant Lead Counsel, on behalf of the Settlement Class, a secured interest in all of the assets that are Corporate Assets (other than as set forth in Appendix A and other than any right, title, or interest in any Priority Review Voucher) of the Corporate Named Defendants until the obligation in Paragraph 61(a) has been fully satisfied or the prescribed period of time has expired; and (2) the Corporate Named Defendants give and grant Lead Counsel, on behalf of the Settlement Class, a secured interest in the Priority Review Voucher that is a Corporate Asset until the obligations of Paragraph 61(b) have been fully satisfied or the prescribed period of time has expired. The Corporate Named Defendants shall promptly provide information requested by Lead Counsel to facilitate the perfection or enforcement of the security interest granted under the collateral agreement. If a Corporate Named Defendant files for bankruptcy protection, within this 10 year period, the Corporate Defendants shall not object to Lead Counsel asserting, on behalf of the Settlement Class, the appropriate security interest as a Secured Creditor with the appropriate court. Lead Counsel shall use any money or assets they obtain through the security interests set forth in this Section J for the benefit of the Settlement Class.

K.     **Exclusion from the Settlement**

85.     Subject to Court approval, any entity seeking exclusion from the Settlement Class must file a valid, written request for exclusion by the Opt-Out Deadline. Any entity that files such a request shall be excluded from the Settlement Class and shall have no rights with respect to the Settlement. Subject to Court approval, a request for exclusion that does not comply with all of the provisions set forth in the applicable Court-approved notice of settlement to be disseminated to the members of the Settlement Class will be invalid, and the entity(ies) serving such an invalid

request shall be deemed Settlement Class Member(s) and shall be bound by the Settlement upon Final Approval. Lead Counsel shall, within ten (10) business days of the Opt-Out Deadline, provide Defendants with a list and copies of all opt-out requests.

86.     Subject to Court approval, any member of the Settlement Class who submits a valid and timely request for exclusion will not be a Settlement Class Member and shall not be bound by the terms of this Settlement. Defendants reserve all of their legal rights and defenses, including but not limited to any defenses relating to whether any excluded member of the Settlement Class is a member of the Settlement Class or has standing to bring any claim against Defendants.

87.     Subject to Court approval, in the written request for exclusion, the member of the Settlement Class must state its full name, street address, and telephone number and a statement that it wishes to be excluded from the Settlement Class. Any member of the Settlement Class that submits a written request for exclusion must also identify the quantity, price, and location of all indirect purchases and/or reimbursements of Daraprim that it made during the Settlement Class Period.

### L.     The Class Settlement Fund

88.     The Escrow Account shall be established as a "qualified settlement fund" as defined in Section 1.468B-1(a) of the United States Treasury Regulations.

89.     The Escrow Agent for the Escrow Account shall be an independent third party entity selected by Lead Counsel.  The Escrow Agent shall remain under the jurisdiction of the Court until its services are completed and funds are distributed by the claims administrator.

90.     The cost of settlement notice, claims administration, class representative's service award, attorneys' fees, reimbursement of all actual expenses of the Action, any other

litigation costs of Plaintiff, and all applicable taxes, if any, shall be paid from the Class Settlement Fund. Lead Counsel may pay from the Class Settlement Fund the actual costs of settlement notice, settlement administration, and taxes without further order of the Court before the Settlement receives Final Approval. In the event that the Settlement does not receive Final Approval or is later overturned, money paid or incurred for the actual costs of settlement notice, settlement administration, and taxes, including any related fees, shall not be returned or repaid to the Global Settlement Fund or the Corporate Defendants.

91.     The Class Settlement Amount shall be invested in short-term instruments backed by the full faith and credit of the United States Government or fully insured in writing by the United States Government, or money market funds rated Aaa and AAA, respectively, by Moody's Investor Services and Standard and Poor's.

92.     Defendants shall not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Class Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use, or administration.

93.     The distribution of the Class Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Lead Counsel and subject to the approval of the Court. If such approval is not obtained, Lead Counsel shall revise the Plan of Allocation as necessary until approval of the Court is obtained. Defendants shall have no participatory or approval rights with respect to the selection of the claims administrator, the claims administration process, or the Plan of Allocation, and the Court's rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement. Defendants shall not object to Plaintiff's Plan of Allocation.

94.     Subject to Court approval, any attorneys' fees, costs, and expenses awarded to Lead Counsel by the Court, and any service awards awarded to Plaintiff in connection with this Settlement shall be paid from the Class Settlement Fund upon such an order from the Court, notwithstanding any appeals. Plaintiff and/or Lead Counsel will request any such attorneys' fees, costs, expenses, and service awards from the Court via motion. Nothing herein shall prevent Lead Counsel from seeking multiple awards of attorney's fees, costs, or expenses over time to account for Class Contingent Payments received in the future. Should an appellate court reverse the Court's Final Approval of the Settlement, Lead Counsel shall repay all such attorneys' fees, costs, and expenses awarded, unless otherwise provided by the Court, and with the exception of money paid or incurred for the costs of settlement notice, settlement administration, and taxes. If, as a result of any appeal or further proceedings, an award of attorneys' fees, costs, and/or expenses to Lead Counsel is reduced or reversed, Lead Counsel shall repay the fees, costs and expenses to the Class Settlement Fund, including accrued interest at the same net rate as is earned by the Class Settlement Fund, with the exception of money paid or incurred for notice and settlement administration costs and taxes.

**M.  Termination and Rescission**

95.     If the Court refuses to approve the Settlement, such approval is reversed on appeal, or if the Settlement is terminated pursuant to the Parties' Supplemental Agreement Regarding Settlement Exclusion,[1] then Defendants, on the one hand, and Plaintiff, on the other,

---

[1] The Settling Parties have entered into a Supplemental Agreement Regarding Settlement Exclusion, under which the Corporate Defendants may terminate the Settlement if the number of Settlement Class Members who seek exclusion from the Settlement Class exceeds a certain percentage. The Settling Parties have agreed to keep the exclusion percentage confidential unless the Court orders otherwise. The Parties will disclose the agreement *in camera* to the Court upon the Court's request.

shall each, in their sole discretion, have the option to rescind this Settlement Agreement in its entirety and return to status *quo ante* (except as hereafter provided in this Section) by written notice to the Court and to counsel for the other Settling Parties filed and served within fourteen (14) calendar days of the event providing the basis for rescission. The Court's handling of Plaintiff's or Lead Counsel's request(s) for attorneys' fees, costs, expenses, or service awards, including any approvals, denials, or modifications of such requests, shall not affect the terms of this Settlement Agreement and shall not be grounds for rescission. Further, a modification or reversal on appeal of any amount of the Class Settlement Fund that the Court authorizes to be used to pay Plaintiff's attorneys' fees, costs, expenses, or service awards, shall not be deemed a modification of all or part of the terms of this Settlement Agreement or such final judgment order, and shall not be grounds for rescission.

96.     If the Settlement Agreement is rescinded for any valid reason set forth in this Section M, then the balance of the Class Settlement Fund in the Escrow Account, excluding any unpaid expenses, shall be returned to the Global Settlement Fund within fourteen (14) calendar days, to be held in trust to satisfy any subsequent settlement or judgment in this Action.  In the event the Settlement Agreement is rescinded, the funds already properly expended for the costs of notice and administration will not be returned to the Global Settlement Fund or the Corporate Defendants. Additionally, in such event, funds to pay for notice, administration expenses, or taxes that have been properly incurred but not yet paid will also not be returned to the Global Settlement Fund or the Corporate Defendants.

97.     If the Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Action as of the Execution Date. This includes the tolling of all applicable statutes

of limitation for class and individual claims. In that event, the Action will proceed as if this Settlement Agreement had never been executed, and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Action or otherwise for any purpose. Plaintiff and Defendants expressly reserve all rights if the Settlement Agreement does not become effective or if it is rescinded by Plaintiff or Defendants pursuant to this Section M. Defendants' right to rescind this Settlement Agreement is a material term of this Settlement Agreement.

**N.    Taxes**

98.    Lead Counsel or their agents shall be solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund, shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund, and shall be solely responsible for taking out of the Settlement Fund, when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. Defendants shall have no responsibility to make any filings related to the Settlement Fund and shall have no responsibility to pay taxes on any income earned by the Settlement Fund. However, in the event the Settlement does not become final and any funds including interest or other income are returned to the Corporate Defendants, the Corporate Defendants shall be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. Defendants make no representations regarding, and shall not be responsible for, the tax consequences of any

payments made pursuant to this Settlement Agreement to Lead Counsel or to any Settlement Class Member.

   **O.**   **Miscellaneous**

99.    This Settlement Agreement constitutes the entire agreement between Plaintiff and Defendants pertaining to the Settlement of the Action. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiff and Defendants.

100.    Neither this Settlement Agreement nor any negotiations or proceedings connected with it shall be deemed or construed to be an admission by any party or any Releasee of any wrongdoing or liability or evidence of any violation by Defendants of any federal or state statute or law either in the Action or in any related actions or proceedings, and evidence thereof shall not be discoverable or used, directly or indirectly, in any way, except in a proceeding to interpret or enforce this Settlement Agreement. This Settlement Agreement represents the settlement of disputed claims and does not constitute, nor shall it be construed as, an admission or disparagement of the correctness of any position asserted by any party, or an admission of liability or lack of liability or of any wrongdoing or lack of any wrongdoing by any party, or as an admission of any strengths or weaknesses of Plaintiff's claims or Defendants' defenses. The Settlement Amount is paid as a commercial settlement and not as a fine. Defendants specifically deny any wrongdoing or liability by any of the Releasees.

101.    This Settlement Agreement may be executed in counterparts by Plaintiff and Defendants, and a fax or scanned signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

102.    Neither Plaintiff nor Defendants shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of

interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

103.    The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

104.    The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

105.    Any disputes between Plaintiff and Defendants concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be submitted to the Court.

106.    This Settlement Agreement shall be governed and interpreted according to the substantive laws of New York, without regard to its choice of law or conflict of law principles.

107.    Each Settling Party acknowledges that it has been and is being fully advised by competent legal counsel of such party's own choice and that such party's execution of this Settlement Agreement is with the advice of such party's counsel and of such party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other Settling Parties to reach an informed decision, and has, independently and without relying upon the other Settling Parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement, and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

108.    Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

AGREED TO ON BEHALF OF
PLAINTIFF **BCBSM, INC.** AND THE
**PROPOSED CLASS**

By: /s/ Ben Steinberg

Kellie Lerner
Benjamin Steinberg (admitted *pro hac vice*)
900 3rd Ave, Suite #1900
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
klerner@robinskaplan.com
bsteinberg@robinskaplan.com

*Counsel for Plaintiff BCBSM, Inc., d/b/a*
*Blue Cross and Blue Shield of Minnesota,*
*and the Proposed Class*

AGREED TO ON BEHALF OF
DEFENDANTS **VYERA**
**PHARMACEUTICALS, LLC** and
**PHOENIXUS AG**

By: /s/ Steven A. Reed

Steven A. Reed
MORGAN LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
Telephone: (215) 963-5603
Facsimile: (215) 963-5001
steven.reed@morganlewis.com

*Counsel for Defendants Vyera*
*Pharmaceuticals, LLC and Phoenixus AG*

AGREED TO ON BEHALF OF
DEFENDANT **KEVIN MULLEADY**

By: /s/ 

Kenneth R. David
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1893
Facsimile: (212) 506-1800
kdavid@kasowitz.com

*Counsel for Defendant Kevin Mulleady*


AGREED TO ON BEHALF OF
DEFENDANT **MARTIN SHKRELI**

By: /s/ *Christopher H. Casey*

Christopher H. Casey
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
Telephone: (215) 979-1155
Facsimile: (215) 689-2194
CHCasey@duanemorris.com

*Counsel for Defendant Martin Shkreli*